## ATTORNEY-GENERAL *v*. TAGGART.

The chair of the governor is vacant, within the meaning of the 49th article of the constitution, when his permanent or temporary disability and the necessities of the public service require his official duties to be performed by a substitute.

The question of the existence of such a vacancy may be determined on a petition for a *mandamus* brought by the attorney-general.

PETITION, for a *mandamus* against the president of the senate, filed in compliance with a request made by the governor in the following letter:

Antrim, Mar. 31, 1890.

Daniel Barnard, Esq.,
Attorney-General :

Dear Sir : Please take such steps as you think necessary to cause the president of the senate to exercise the powers of the office of governor during the vacancy caused by my illness. I am not able to perform the duties of the office, and the public service should not suffer from my inability.

Very truly yours,

D. H. Goodell.

[Copy of the Petition.]

To the Supreme Court.

Hillsborough, ss.

Daniel Barnard, attorney-general of the state of New Hampshire, in behalf of said state, complains against David A. Taggart, and says the chair of the governor of said state has been and is vacant by reason of the sickness of His Excellency David H. Goodell, and his consequent inability to perform any of the duties of his office, and the said Taggart is president of the senate of said state; yet said Taggart does not exercise any of the powers and authorities which by the constitution and laws the governor is vested

with, but refuses so to do. Wherefore the plaintiff prays for a writ of *mandamus*, or other appropriate and adequate process, directed to the said Taggart, requiring him to exercise the powers and authorities of the governor during the vacancy, according to his duty in the premises.

Daniel Barnard,<br>Attorney-General.

### [Order of Notice.]

### In the Supreme Court.

Hillsborough, ss.

This petition having been filed this first day of April, 1890 :

It is ordered, that the plaintiff notify the said David A. Taggart to appear at the term of said court now in session at Manchester in said county of Hillsborough, on the seventh day of April, 1890, at eleven o'clock in the forenoon, and show cause why the prayer of said petition should not be granted, by giving to him in hand an attested copy of said petition and this order thereon, or by leaving a like copy at his usual place of abode, at least three days before said 7th day of April.

It is further ordered, that a like copy be served in like manner upon His Excellency the Governor, David H. Goodell.

Thos. D. Luce,<br>Clerk.

Daniel Barnard,  &#125; Att'ys for plaintiff.
R. M. Wallace,

### [Defendant's Answer.]

The defendant says he does not exercise any of the powers and authorities of the governor's office, because his duty to do so is not settled by any adjudication or conclusive evidence of record. He is ready to do his duty when he has authoritative evidence as to what it is, and thereof submits to the judgment of the court.

David A. Taggart.

David Cross, Att'y for defendant.

The case was submitted upon evidence introduced by the plaintiff and heard by the whole court (*Kerr* v. *Trego*, 47 Pa. St. 292, 295) at the trial term at Manchester, April 7, 1890, and was not entered in the law term. April 16, 1890, the clerk was directed to enter "Judgment for the plaintiff."

DOE, C. J. "Whenever the chair of the governor shall become vacant, by reason of his death, absence from the state, or otherwise, the president of the senate shall, during such vacancy, have and exercise all the powers and authorities which, by this constitution, the governor is vested with when personally present; but

when the president of the senate shall exercise the office of governor, he shall not hold his office in the senate." Const., *art.* 49. From 1784 to 1792, the governor (then styled "the president of the state of New Hampshire") was president of the senate. Instead of his present power of vetoing or approving bills passed by the senate and house, he had "a vote equal with any other member" of the senate, and "also" "a casting vote in case of a tie;" and when his office was vacant, all his powers were exercised by "the senior senator." In fact, though not in name, the senior senator was lieutenant-governor, as the president of the senate is now. When the constitution took effect, and the legislature met for the inauguration of the new government, June 2, 1784, Meshech Weare, the governor-elect, was unable to be present. In brief periods of his illness and absence, in June, 1784, and February, 1785, his duties were performed by Woodbury Langdon, senior senator, acting as governor *pro tem.* On both occasions Langdon presided in the senate by virtue of his position as acting governor; and on the 8th of June, 1784, as acting governor, he sat with the council, and exercised the governor's power (with the required advice and consent of the council) of signing warrants for the payment of money out of the state treasury. The authority of this precedent has not been shaken, and it does not appear that the soundness of the contemporaneous construction has ever been doubted.

"' Where a word having a technical as well as a popular meaning is used in the constitution, the courts will accord to it its popular signification, unless the very nature of the subject indicates, or the text suggests, that it is used in its technical sense.' *Weill* v. *Kenfield*, 54 Cal. 111; *Sprague* v. *Norway*, 31 Cal. 173. Words used in a constitution should be construed in the sense in which they were employed. They 'must be taken in the ordinary and common acceptation, because they are presumed to have been so understood by the framers, and by the people who adopted it. . . . It . . . owes its whole force and authority to its ratification by the people; and they judged of it by the meaning apparent on its face according to the general use of the words employed, where they do not appear to have been used in a legal or technical sense.' *Manly* v. *State*, 7 Md. 135." *Miller* v. *Dunn*, 72 Cal. 462, 465. Usage has not attached a narrow meaning to the phrase "vacant by reason of his death, absence from the state, or otherwise;" and the law does not throw the public service into confusion by applying rules of construction that were not applied by the people when the constitution was adopted. Effect is to be given to the understanding and intent of the voters who enacted *art.* 49 for cases of necessity, and used "otherwise" in its comprehensive and usual sense. In the connection in which the word here occurs, "otherwise" includes the governor's physical disability as equivalent, for the provisional purpose of this article, to his death, or to his absence from the state.

" The object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it. . . . We must presume that words have been employed in their natural and ordinary meaning. As *Marshall*, Ch. J., says,— The framers of the constitution, and the people who adopted it, ' must be understood to have employed words in their natural sense, and to have intended what they have said.' *Gibbons* v. *Ogden*, 9 Wheat. 1, 188. This is but saying that no forced or unnatural construction is to be put upon their language ; and it seems so obvious a truism that one expects to see it universally accepted without question ; but the attempt is made so often by interested subtlety and ingenious refinement to induce the courts to force from these instruments a meaning their framers never held, that it frequently becomes necessary to redeclare this fundamental maxim. Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned or unlearned, may be able to trace the leading principles of government. . . . The real question is, what the people meant, and not how meaningless their words can be made by the application of arbitrary rules." When there is doubt, evidence may be found in the primary and leading " object to be accomplished or the mischief designed to be remedied or guarded against by the clause in which the ambiguity is met with. ' When we once know the reason which alone determined the will of the lawmakers, we ought to interpret and apply the words used in a manner suitable and consonant to that reason, and as will be best calculated to effectuate the intent.' Smith Stat. and Const. Construction 634. . . . We have not thought it important to quote and to dwell upon those arbitrary rules to which so much attention is sometimes given, and which savor rather of the closet than of practical life. . . . They are more often resorted to as aids in ingenious attempts to make the constitution seem to say what it does not, than with a view to make that instrument express its real intent. All external aids, and especially all arbitrary rules, applied to instruments of this popular character, are of very uncertain value ; and we do not regard it as out of place to repeat . . . that they are to be made use of with hesitation, and only with much circumspection." Cool. Con. Lim. 69, 73, 75, 80, 101.

The primary and leading object of *art.* 49 is evidence tending to show that the construction adopted in the first year of the constitution is correct. The mischief designed to be prevented was the suspension of executive government by the governor's death, absence from the state, or disability. 9 Cong. Record, Part 1, 46th Cong., 1st Session, *pp.* 184–189, 273–285, 287–298, 312–325, 341–355 ; 60 N. H. 585. The prescribed remedy is the duty of a substitute to act in cases of necessity. The services of

a substitute may be necessary when the governor's absence or disability is temporary, as well as when it is permanent.    When there is an office to which no one has a title, and which is in fact held by no one, there is a vacancy.   *Johnston* v. *Wilson*, 2 N. H. 202, 203; Mechem Pub. Officers, *s.* 127.    In *art.* 49, "vacant, by reason of his death, absence from the state, or otherwise," has a broader signification if due weight is given to the evidential force of the primary and leading purpose that the executive work shall go on without interruption.    An intermittent vacancy, such as occurred in the time of Governor Weare, may occur again ; and the evils of an interregnum which *art.* 49 was intended to prevent are not to be introduced by technical reasoning or arbitrary rules.

"If, from the imperfection of human language, there should be serious doubts respecting the extent of any given power,  .  .  . the objects for which it was given  .  .  .  should have great influence in the construction."    *Gibbons* v. *Ogden,* 9 Wheat. 1, 189.    The general object of *art.* 49 forbids a construction that would sometimes cripple the government, and render it powerless in a department in which the public safety requires constant readiness for action.

It is proved by medical testimony that the governor is still in the physical condition stated in his letter to the attorney-general, and that his disability may be reasonably expected to last a few weeks, and perhaps a few months.    It is proved by the testimony of the secretary of state and the state treasurer that there is executive business demanding immediate attention, and that the governor's duties should no longer remain unperformed.    The case being one of necessity, *art.* 49 directs the president of the senate (the defendant) to exercise executive powers until the governor resumes them.

The defendant being reluctant to act without an adjudication, or some conclusive evidence, of an emergency contemplated by *art.* 49, the governor requested the attorney-general to take the steps needed for the protection of public interests.    There might be a case in which the attorney-general would intervene without such request.    While a determination of the question of vacancy, on a petition of this kind, is not legally requisite to call the president of the senate to the executive chair, it may be a convenient mode of avoiding embarrassment that might sometimes arise from doubt and controversy in regard to his authority and the validity of his acts.    The existence of an executive vacancy is a question of law and fact within the judicial jurisdiction.    If the defendant exercised executive power without a previous judgment on that question, the legality of his acts could be contested and determined in subsequent litigation ; and the judicial character of the question does not depend upon the time when it is brought into court. With adequate legal process, the consideration and decision of such a question may be prospective as well as retrospective.

*Mandamus* " is a writ, in England, issuing out of the king's bench, in the name of the king, and is called a prerogative writ, but considered a writ of right; and is directed to some person, corporation, or inferior court, requiring them to do some particular thing, therein specified, which appertains to their office or duty, and which is supposed to be consonant to right and justice, and where there is no other adequate specific remedy. . . . The theory of the British government and of the common law is, that the writ of *mandamus* is a prerogative writ, and is sometimes called one of the flowers of the crown, and is therefore confided only to the king's bench, where the king, at one period of the judicial history of that country, is said to have sat in person, and is presumed still to sit. And the power to issue this writ is given to the king's bench only, as having the general supervising power over all inferior jurisdictions and officers, and is coextensive with judicial sovereignty. And the same theory prevails in our state governments where the common law is adopted. . . . The power of issuing this writ is generally confided to the highest court of original jurisdiction." *Kendall* v. *U. S.*, 12 Pet. 524, 614, 620, 621.

" By the principles of the common law, . . . no court has a right to issue the prerogative writ of *mandamus*, unless it was a court in which the judicial sovereignty was supposed to reside, and which exercised a general superintendence over the inferior tribunals and persons throughout the nation or state. In England this writ can be issued by the king's bench only. . . . The peculiar character and constitution of that court, from which it derives this high power, are so well known and familiar to every lawyer, that it is scarcely necessary to cite authorities on the subject. Its peculiar powers are clearly stated in 3 Bl. Com. 42. . . . Mr. Justice *Buller* . . . also places the right to issue this writ upon the peculiar and high powers of the court of king's bench. . . . In all of the authorities it is uniformly called ' a prerogative writ,' in order to distinguish it from the ordinary process which belongs to courts of justice : and it was not originally considered as a judicial proceeding, but was exercised as a prerogative power. In the case of *Awdley* v. *Joy*, Popham 176, *Doddridge*, Justice, said,—' This court hath power not only in judicial things, but also in some things which are extrajudicial. The maior and comminalty of Coventry displaced one of the aldermen, and he was restored; and this thing is peculiar to this court, and is one of the flowers of it.'

" These peculiar powers were possessed by the court of king's bench, because the king originally sat there in person. . . . According to the theory of the English constitution, the king is the fountain of justice, and where the laws did not afford a remedy, and enable the individual to obtain his right, by the regular forms of judicial proceedings, the prerogative powers of the sov-

ereign were brought in aid of the ordinary judicial powers of the court, and the *mandamus* was issued in his name to enforce the execution of the law. And although the king has long since ceased to sit there in person, yet the sovereign is still there in construction of law, so far as to enable the court to exercise its prerogative powers in his name; and hence its power to issue the writ of *mandamus*, the nature of which Justice *Doddridge* so forcibly describes by calling it extrajudicial, and one of the flowers of the king's bench. . . . By the principles of the common law, this power would not be incident to any court which did not possess the general superintending power of the court of king's bench, in which the sovereignty might, by construction of law, be supposed to sit, and to exert there its prerogative powers in aid of the court, in order that a right might not be without a remedy." *Taney*, C. J., in *Kendall* v. *U. S.*, 12 Pet. 524, 629, 630.

In the case mentioned by *Doddridge*, of an alderman wrongfully displaced, if the board was not judge of the election of its members, and no other tribunal was specially provided, the official title of the displaced member, like his title to land or chattels, was determinable in a court of general common-law jurisdiction, and could not be classed with extrajudicial questions without disregarding the nature of the subject and the precedents of *quo warranto*. "A writ of *quo warranto* is in the nature of a writ of right . . . against him who claims or usurps any office, . . . to inquire by what authority he supports his claim, in order to determine the right." 3 Bl. Com. 262. "As the election officers perform for the most part ministerial functions only, their returns, and the certificates of election which are issued upon them, are not conclusive, . . . but the final decision must rest with the courts. This is the general rule, and the exceptions are of those cases where the law under which the canvass is made declares the decision conclusive, or where a special statutory board is established with powers of final decision." Cool. Con. Lim. 785; Mechem Pub. Officers, ss. 213, 480; Shortt Ex. Rem., c. 3; High Ex. Rem., s. 634; *Robertson* v. *State*, 109 Ind. 79, 99. The forty-second article of the constitution provides that the returns of votes for governor shall be canvassed by the senate and house of representatives. The canvass is not conclusive, the power of final decision is not conferred upon a special statutory or constitutional board, and the controversy on matters of law and fact involved in disputed claims to the office is not an exception to the rule that judicial questions are settled by judicial decisions. A contested election of the chief executive magistrate is not selected and set apart as the only election case to be left undecided.

"A *mandamus*, in modern practice, is nothing more than an action at law between the parties, and is not now regarded as a prerogative writ. It undoubtedly came into use by virtue of the prerogative power of the English Crown. . . . But the right to the

writ, and the power to issue it, has ceased to depend upon any prerogative power, and it is now regarded as an ordinary process in cases to which it is applicable." *Kentucky* v. *Dennison*, 24 How. 66, 97; *Gilman* v. *Bassett*, 33 Conn. 298, 305. Upon the American theory of government, the state being sovereign, the people being the state, and all magistrates and public officers being "their substitutes and agents" (Bill of Rights, *arts.* 7, 8), a *mandamus*, properly issued by such agents in the name (Const., *art.* 87) and by the authority of the principal, is not inferior to a prerogative writ issued in the name of the king, from the king's bench, when the king sat there in person; and other legal process, properly issued by the same agents, and enforcible by the power of the same principal, is not less effective, in the business assigned to it, than a *mandamus*. All writs, lawfully issued in the name of the state and by its authority, are the state's commands, requiring something to be done by a sheriff, or other official or unofficial person; and a division of such orders into superior and inferior classes may be misleading. As our common law furnishes all writs necessary for the furtherance of justice and the due administration of the laws, there can be no legal right without a remedy, and there is no occasion in this case to consider peculiar powers of the king's bench (continuously vested in this court since 1699), or to distinguish between ordinary and extraordinary process, or between prerogative and other powers. *Boody* v. *Watson*, 64 N. H. 162, 169–171, 178, 179.

The statement that a *mandamus* can be granted, or a bill in equity can be maintained, when there is no other adequate remedy, may be understood in a sense at variance with New Hampshire law. There would be adequate remedies if a *mandamus* were unknown in England, and chancery had not been invented as a separate jurisdiction. "*Mandamus*," "trespass," and other names of ancient forms of action, are used here as references to the character of rights asserted, wrongs complained of, or remedies sought, in particular cases, but with no recognition of the forms as tests or limitations of rights or remedies. When, as in this petition, with due precision and brevity, a plaintiff asserts a legal right and an infringement of it, and asks appropriate relief, his case is decided on the facts proved, without a waste of time in the consideration of a form of action. *Gage* v. *Gage, ante, pp.* 282, 283, 289, 293, 296. It may be said that there is no form of action, or that the only one is a party's application for a judgment, and his averment of a ground on which he is entitled to it. Such terms as *assumpsit*, *certiorari*, and *mandamus*, when used to measure and define causes of action, may present an obsolete doctrine of procedure and an inaccurate view of rights.

An exercise of judgment on a question of fact is frequently called discretion, when there is no appeal and no power of revising the decision. 18 Pick. 446; 50 N. H. 120; 52 N. H. 408; 64 N. H.

186, 259. The question may be as broad as the justice, wisdom, or expediency of a course to be taken on any executive, judicial, or legislative subject. The day on which there should be a special ward meeting, called by the common council of a city, for the election of an alderman, may be a matter of fact that would not ordinarily be determined on *mandamus.* In *People* v. *Common Council,* 77 N. Y. 503, 511, 512, it was held that the court was "justified in fixing the time for the election. The defendant by its return denied that there was a vacancy to be filled, and, although notified by the mayor of the necessity for an election, instituted no proceedings in regard to it. An order to proceed would have been nugatory unless accompanied by a special direction as to the time of the election. It is insisted, however, that this was within the discretion of the common council; and so it was, but the discretion was to be exercised and not withheld. It was also to be so exercised that the order and election should be complete within the time provided. . . . And as it was obvious from the return that the discretion vested was to be abused or so exercised as to work injustice, it was a matter to be considered by the court."

"If the law requires a certain thing to be done, we may order it to be done by the party upon whom the obligation of doing it is imposed. If he is to act according to his discretion, and he will not act or even consider the matter, we may compel him to put himself in motion to do the thing, but we cannot control his discretion." *Best,* J., in *Rex* v. *Justices,* 2 B. & C. 286, 291. "*Mandamus* . . . extends to all cases of neglect to perform a legal duty, where there is no other adequate remedy. It applies to judicial as well as ministerial acts. If the duty be judicial, the mandate will be to the officers to exercise their official discretion or judgment, without any direction as to the manner in which it shall be done. If it be ministerial, then the *mandamus* will direct the specific act to be performed. . . . Were application made to county commissioners to estimate damages caused by the laying out of a railroad, turnpike, or common highway, the duty required of them would be a judicial duty. If they refused or neglected to perform it, this court would issue a *mandamus* commanding them to do it; that is, to exercise their judgment upon the matter." *Carpenter* v. *County Commissioners,* 21 Pick. 258, 259.

In this case, the inquiry is not whether the defendant can be compelled by *mandamus* to exercise the governor's powers in a particular manner (approve and sign a bill passed by the senate and house, concur with the council in the appointment of a justice of the peace or the pardon of a convict, or perform a ministerial act requiring no exercise of judgment), or whether the independence of each branch of the government shall be maintained in matters of law or fact which it is exclusively authorized to determine (*Rex* v. *Fowey,* 2 B. & C. 584, 596, 598, *Decatur* v. *Paulding,*

14 Pet. 497, 515–517, *Kentucky* v. *Dennison*, 24 How. 66, 106, *Secretary* v. *McGarrahan*, 9 Wall. 298, 312, *Cotten* v. *Ellis*, 7 Jones, N. C., 545, 550, Cool. Con. Lim. 136), but whether there is a vacancy during which it is the defendant's duty to act under *art.* 49, and whether the state shall have the executive service to which it is entitled. "The court will not interfere by *mandamus* with the executive officers of the government in the exercise of their ordinary official duties, . . . the court having no appellate power for that purpose; but when they refuse to act in a case at all . . . a *mandamus* may be issued to compel them." *United States* v. *Black*, 128 U. S. 40, 48; *United States* v. *Raum*, 135 U. S. 200, 204. The law generally authorizes coercion when a public officer refuses to act in a particular case in which it is his duty to act. Smith, N. H., 482; *Butler* v. *Selectmen*, 19 N. H. 553; *Ballou* v. *Smith*, 29 N. H. 530; *School-District* v. *Carr*, 63 N. H. 201; *School-District* v. *Greenfield*, 64 N. H. 84; *Boody* v. *Watson*, 64 N. H. 162. His refusal to act in all cases is not an exception to the rule applicable to his refusal in a single case.

Between the governor's and the defendant's right to "exercise all the powers" of the governor's office there is no difference that excludes this case from the jurisdiction in which the title of the office could be determined if it were disputed. If the title may be regarded as, in some sense, remaining in the elected governor while his chair is occupied by the acting governor, the defendant's right to exercise all the governor's powers is, for some practical purposes, equivalent to a temporary title. It might be argued that to "exercise the office," within the meaning of *art.* 49, is to hold it. If the defendant were acting as governor, a *quo warranto*, brought against him by the plaintiff, would raise the same issue of vacancy or no vacancy that is presented by this petition. In that case, the inquiry would be whether it was his right to exercise the governor's powers. In this case, the inquiry is whether it is his duty to exercise them. If his exercise of them is his right, it is his duty, and a public right.

"The public has a right to the services of all the citizens, and may demand them in all civil departments as well as in the military." *Hoke* v. *Henderson*, 4 Dev. Law 1, 29; *Bowles* v. *Landaff*, 59 N. H. 164, 191. The state's right to the executive service of the president of the senate under *art.* 49 is no less enforcible than its right to the judicial service of a juror. There is no express or implied exemption of the executive substitute from the compulsion of legal process. "As civil officers are appointed for the purpose of exercising the functions and carrying on the operations of government and maintaining public order, a political organization would seem to be imperfect which should allow the depositaries of its power to throw off their responsibilities at their own pleasure. This certainly was not the doctrine of the common law. In England, a person elected to a municipal

office was obliged to accept it and perform its duties, and he subjected himself to a penalty by refusal. An office was regarded as a burden which the appointee was bound, in the interest of the community and of good government, to bear." *Edwards* v. *United States*, 103 U. S. 471, 473. The common-law obligation to accept town offices is affirmed in Gen. Laws, *c.* 41. "A party who has been elected to an office owes a duty to the public to qualify himself therefor, and to enter upon the discharge of his duties. Such duty being incumbent on him by law, he may be compelled by the writ of *mandamus* to assume the office, and take upon himself the duties thereof. Though he may be subject to an indictment or fine for failure to do so, still the writ of *mandamus* will be granted, because neither the indictment nor the fine is an adequate remedy in the premises, since it does not fill the office and prevent a failure of the discharge of the public duties." Merrill Mandamus, *s.* 145; High Ex. Rem. *s.* 334; *People* v. *Williams*, 145 Ill. 573. By accepting the office of president of the senate, the defendant accepted the executive work which *art.* 49 imposes upon the president of the senate when the governor's chair is vacant. Whatever open questions there may be concerning the duty of accepting an office and the right of resigning it, the duty of doing the work of an office that has been accepted and has not been resigned is a subject on which there can be no difference of opinion. "Every man is obliged, upon a general principle, after entering upon office, to discharge the duties of it while he continues in office." *Hoke* v. *Henderson*, 4 Dev. Law 1, 29.

If the defendant were exempt from *mandamus*, there would be another question. "That a man who has a judgment for possession may enter without a writ, is common learning. . . . And why should the commonwealth, which cannot be disseised, the whole people, require the aid of an officer to give them actual possession, when it is not necessary in the case of an individual? The highest evidence of title that can exist is the solemn judgment of a court. When, then, this judgment says that the demanded premises, which were the property of A, have been forfeited by him, and have escheated, enured, and accrued to the government,—if this be not evidence that his title was transferred to the government, we must abandon the idea of the absolute verity of judgments. . . . The issuing of a writ of possession on such a judgment was . . . not necessary to complete the absolute title of the government." *M'Neil* v. *Bright*, 4 Mass. 282, 300–302. "The service of a *habere facias* is not necessary to perfect or complete the title evidenced by the judgment. It is a convenient process to enable a party having a judgment in a real action to avail himself of the power of the law to obtain a lawful and peaceable entry and possession under his judgment title. It adds nothing to the strength of such title." *Creighton* v. *Proctor*, 12 Cush. 433, 437; *Farwell* v. *Rogers*, 99 Mass. 33, 35,

A decree that a deed "is hereby reformed," and "shall take and have effect for all purposes as if it had been originally made as now reformed," corrects the erroneous evidence of title without a writ of possession or an additional conveyance. *Winnipisseogee Lake Co.* v. *Perley*, 46 N. H. 83, 109; *Boody* v. *Watson*, 64 N. H. 162, 182. In the construction of wills and trusts, and in the location of boundaries, private ways, dams, and public water-ways, declarative judgments may be complete remedies, settling controversies and removing doubts without the aid of the sheriff. Pom. Eq., *s.* 171; *Wheeler* v. *Perry*, 18 N. H. 307; *Goodhue* v. *Clark*, 37 N. H. 525, 531; *Petition of Baptist Church*, 51 N. H. 424; *Methodist Society* v. *Harriman*, 54 N. H. 444; *Kimball* v. *Norton*, 59 N. H. 1; *Marcy* v. *Amazeen*, 61 N. H. 131; *Gardner* v. *Webster*, 64 N. H. 520, 522, 523; *Concord Mfg. Co.* v. *Robertson*, *ante*, *pp.* 1, 19, 20. What trees a tenant for life can cut without committing waste, may be judicially determined before they are cut as well as afterwards. *Bennett* v. *Danville*, 56 N. H. 216. The validity of a judgment establishing his right to cut all trees of a certain description, or all on a certain lot, does not depend upon the judgment's being carried into effect by legal process. A common-law award is a judgment, and by such a judgment a title or right may be determined without subsequent process of enforcement. *Truesdale* v. *Straw*, 58 N. H. 207, 213. A real action lies for a remainder in fee expectant upon a life estate. Although the tenant for life cannot be ousted, and a judgment against a claimant of the remainder cannot be enforced by any process that will give the plaintiff the occupation, use, or income of the land during the life of the tenant, justice may require a judication of the disputed title of the remainder. *Walker* v. *Walker*, 63 N. H. 321, 323, 324, 327.

If a judgment in this case could not be carried into execution by a writ of *mandamus*, the plaintiff might contend that the suit should not be dismissed for want of jurisdiction. An amendment of the petition could raise the question whether the best procedure would enable the state to obtain a judgment establishing the fact of an executive vacancy, and the public right to the defendant's service as a substitute. A decision of this question might be as important as an adjudicated reformation of a deed, or as any other establishment of a private right by a declarative judgment.

*Judgment for the plaintiff.*

All concurred.