Belknap
No. 7001

ROBERT J. REGAN & a.

v.

SYREN HOVANIAN & a.

January 31, 1975

*Wescott, Millham & Dyer (Mr. Peter V. Millham* orally) for the plaintiffs.

*Decker & Hemeon and Philip T. McLaughlin (Mr. McLaughlin* orally) for the defendants.

GRIMES, J. The main issue in this case is whether the evidence supported the findings and rulings that plaintiffs have an easement running to Lake Winnipesaukee over an eight-foot strip of land, title to which was found to be in defendants.

Plaintiffs brought this petition to quiet title to an eight-foot strip of land which is a portion of Morris Avenue shown on a plan of lots referred to in deeds by which both plaintiffs and defendants obtained their title to their respective lots. A hearing was held before a Master *(Leonard C. Hardwick,* Esq.) who ruled that, although defendants had title to the eight-foot strip, the plaintiffs were entitled to use it for access to the lake, sun bathing, access to boats, and other uses which would customarily go with a waterfront interest. The master's report was approved by *Batchelder,* J., and defendants' exceptions were transferred by *Keller,* C.J.

The disputed land lies on the shore of Lake Winnipesaukee in that part of Laconia known as the Weirs. It was originally part of a large tract owned by the Winnipesaukee Camp Meeting Association, hereinafter called the association. Sometime in the late eighteen hundreds, the land was divided into lots with streets, all of which was shown on a plan which was recorded in the Belknap County Registry of Deeds. The plan shows a street called Lake Shore Avenue running along the shore of the lake in a generally north-south direction with the lake as the easterly boundary. Streets, of which Morris Avenue was one, ran parallel with one another in a generally east-west direction leading to Lake Shore Avenue. Plaintiffs now own a plot on the northerly side of Morris Avenue and defendants own land between plaintiffs' land and the lake. The eight-foot strip lies between Lake Shore Avenue and the lake and is opposite the base of Morris Avenue. Sometime in the early nineteen hundreds, after all lots on the plan had been sold, the association began selling narrow lots on the lake shown on a later plan thus establishing an easterly sideline for Lake Shore Avenue where none, other than the lake, had hitherto been shown.

By deed dated November 24, 1961, recorded January 11, 1962, the association conveyed to New Hampshire Timbers Inc., its remaining land including all right, title and interest it may have had in all streets including Morris Avenue, subject, however, to all existing easements in favor of certain corporations such as the

Public Service Company and also subject to "whatever rights the abutting owners . . . may have in and to the streets . . . ."

New Hampshire Timbers Inc. in 1963 conveyed to plaintiffs' predecessor in title described by metes and bounds an eight-foot strip running to the lake which constituted the northerly half of Morris Avenue along its entire length to the lake. The easterly part of this strip between Lake Shore Avenue and the lake is the land in question.

Previously, however, by deed dated September 22, 1941, one LaPierre, a predecessor in title of the defendants, conveyed this same disputed eight-foot strip to one Lang, also a predecessor in title of the defendants. That deed stated that it was the "same premises conveyed to the Grantors by the Winnipesaukee Camp Meeting Asso. Nov. 21, 1925. This lot being subject to the conditions stipulated in said Winnipesaukee Camp Meeting Asso. deed".

Thereafter, this eight-foot strip came through various conveyances to the defendants. Each deed in the chain, however, contained the identical reference to the same conditions. The master found that these conditions were "apparently unknowable." However, there is no record of any conveyance of this eight-foot strip to anyone by the association prior to the 1961 deed to Timbers, and LaPierre testified that none had been made to him although he testified that his mother had told him she had bought it.

The master found that the original development "was laid out so that occupants of the development would have access to and use of the lake facilities". He also found that "[a]ll purchasers of lots had notice of the plans and took their title subject to whatever rights such plans may have indicated to others". There was evidence that the eight-foot strip in question was used from time to time by the plaintiffs and their predecessors in title to reach the lake for various purposes.

The master found that none of the "parties hereto had such continuous, exclusive or hostile possession of the eight-foot strip for a period of twenty years or more as would give to any exclusive title or possession". He further found that the defendants acquired title to the eight-foot strip but that on all the evidence their title was not such as to bar plaintiffs from the use of the strip. The master's findings were supported by the evidence and his rulings were correct.

Plaintiffs and their predecessors and defendants and their predecessors all took title with reference to the same plan which showed

the various streets including Morris Avenue and Lake Shore Drive running to the lake. Implied easements thereby arose giving plaintiffs the right to use these streets to reach the lake. *Douglass v. Company,* 76 N.H. 254, 81 A. 1086 (1911); *McCleary v. Lourie,* 80 N.H. 389, 117 A. 730 (1922).

Defendants' title is based upon adverse possession under color of title which by its terms is subject to unknown conditions. But the possession of the defendants, although sufficient to acquire title, was not such as to extinguish the plaintiffs' easement. *New England Box Co. v. Wood,* 81 N.H. 124, 123 A. 826 (1923); *Howard v. Britton,* 67 N.H. 484, 41 A. 269 (1893); 3 American Law of Property §§ 15.13-.14 (1952, Supp. 1962); Annot., 25 A.L.R.2d 1265 (1952, Supp. 1970). The very terms of defendants' deed giving color of title showed that the title under which they claimed was not absolute and this limits the character of the possession under it. *Dame v. Fernald,* 86 N.H. 468, 471, 171 A. 369, 370-71 (1934); *Barker v. Company,* 78 N.H. 160, 97 A. 749 (1916). Also, the master has found on adequate evidence that defendants' possession was not so continuous, exclusive or hostile as to give them exclusive title. Unlike the situation in the case of *Nashua Hospital v. Gage,* 85 N.H. 335, 159 A. 137 (1932), the evidence in this case does not dictate a finding of abandonment by the plaintiffs or their predecessors. Here, the master's finding that plaintiffs retained their rights to the use of the disputed land was supported by the evidence and the law.

Defendants contend that they should have been allowed to cross-examine their own witness who was a predecessor in title of the plaintiffs. Not only did defendants take no exception to the master's ruling, but on the record before us we cannot say that the master was in error.

*Exceptions overruled.*

All concurred.

Request of the Senate
No. 7122

OPINION OF THE JUSTICES

February 7, 1975

The following resolution was adopted by the senate on January 15, 1975, and filed with the supreme court on January 20, 1975:

"Whereas, Part 2, Article 49 of the Constitution of New Hampshire provides that the president of the senate shall, during a vacancy in the chair of the governor, exercise all the powers and authorities vested in the governor and further provides '... but when the president of the senate shall exercise the office of governor, he shall not hold his office in the senate.'; and

"Whereas, in the above-quoted portion of Article 49 the words 'his office in the senate' are ambiguous in that it is not clear whether they refer only to his office as president of the senate or whether they refer to the office of senator to which he has been elected; and

"Whereas, a situation whereby the president of the senate could become acting governor may arise at any moment and without prior notice which would not permit timely consideration of this problem by the honorable court; now therefore, be it

"Resolved by the Senate in General Court convened:

"That the Justices of the New Hampshire supreme court be respectfully requested to give their opinion in answer to the following question:

"When the president of the senate is acting governor pursuant to the provisions of Part 2, Article 49 of the New Hampshire Constitution, is he prohibited from holding his office as president of the senate only, or is he prohibited from acting in any manner as a member of the senate?

"That copies of this resolution be submitted to the clerk of the New Hampshire supreme court by the clerk of the senate."

The following answer was returned:

*To the Honorable Senate:*

The undersigned justices of the supreme court submit the following answer to the question presented by your resolution adopted January 15, 1975, and filed with this court on January 20, 1975. Interested parties were permitted to file memoranda until January 31, 1975. Your question relates to New Hampshire constitution, part II, article 49 which reads in part as follows: "[W]hen the president of the senate shall exercise the office of governor, he shall not hold his office in the senate." This provision has been a part of the constitution since its adoption on August 27, 1792. Your question reads as follows: "When the president of the senate is acting governor pursuant to the provisions of Part 2, Article 49 of the New Hampshire Constitution, is he prohibited from holding his office as president of the senate only, or is he prohibited from acting in any manner as a member of the senate?"

Part II, article 49 was the subject of consideration by the court in 1890 in an opinion by Chief Justice Doe in which it was pointed out that under the provisions of the constitution of 1784, during brief periods of absence by the Governor-elect (then styled the president) in 1784 and 1785, the duties of the Governor were performed by the senior senator, acting as Governor *pro tem. Attorney General v. Taggart,* 66 N.H. 362, 364, 29 A. 1027, 1028 (1890); *see* New Hampshire Constitutional Convention Manual, 1918, 78, 89; X Prov. & State Papers 85 (1877). Under the 1784 constitution the "President" also presided in the senate, where he had "a vote equal with any other member" and also "a casting vote in case of a tie". J. F. Colby, Manual of the Constitution of New Hampshire 101, 114 (1912). Unlike the Governor under the constitution of 1792, however, the president did not have the veto power now conferred on the Governor by New Hampshire constitution, part II, article 44. Hence under the prior constitution, as appears from the *Taggart* opinion *supra,* the senior senator, while

acting as "president" *pro tem* also presided in the senate and sat with the council, by virtue of the provision of the constitution then in force. The court then held that the words used in part II, article 49 of the present constitution "should be construed in the sense in which they were employed", and effect given to the article "in its comprehensive and usual sense". *Attorney General v. Taggart, supra* at 364, 29 A. at 1028-29. It also observed: "By accepting the office of the president of the senate, the defendant accepted the executive work which art. 49 imposes upon the president of the senate when the governor's chair is vacant". *Id.* at 372, 29 A. at 1032. *See also Opinion of the Justices,* 87 N.H. 489, 177 A. 655 (1935).

Examination of comparable provisions of constitutions of other States has disclosed no identical provision elsewhere, although many provide for succession to the Governor by a lieutenant governor or a president of the senate under similar circumstances. *See* Index Digest of State Constitutions 509-15 (2d ed. 1959); 38 Am. Jur. 2d *Governor* §§ 13-15, at 942-43 (1968); *Chadwick v. Earhart,* 11 Ore. 389, 4 P. 1180 (1884).

Our attention has been called to an excerpt from a report to the 1792 convention made on June 2, 1792, by the four-man committee of which William Plumer was chairman. The excerpt stated in part: "[I]t appears that under the head [of] Senate, the people have directed the Senate to elect their own President, and authorized him to fill the chair of Governor when vacant, but when he exercises the office of Governor he shall not hold the office of President of the Senate . . . ." Journal of the 1792 Convention; X Prov. & State Papers 143 (1877). The suggestion is that the statement is a "contemporary report" of an understanding of the meaning of what is now article 49.

However, the report of the committee was made following the first submission to the voters, in May 1792, of seventy-two separate amendments to the constitution of 1784, and before the second submission to the voters in August 1792, which was occasioned by inconsistencies resulting from the first submission. Thus it was an analysis of the result of the action of the voters on May 19, 1792, rather than an interpretation of any particular provision of the constitution as finally revised in August 1792.

The report was pointing out that by the adoption of amendments 23 and 38 the voters had provided that a president of the senate rather than the president of the State should preside over that body and should act in place of the Governor in case of a

vacancy, instead of having the senior senator so act as provided by the constitution of 1784. The report continued, by pointing out what resulted from acceptance of amendment 39 and rejection of amendment 40; namely that the title of the chief executive was changed from president to Governor, but he would retain his authority to vote in the senate, and to have a "casting vote in case of a tie" as provided by the constitution of 1784. Journal of the 1792 Convention; X Prov. & State Papers 121, 142 (1877).

These and other inconsistencies prompted the second submission to the voters in August 1792 of several headings of the constitution submitted as a whole (X Prov. & State Papers 152-59) which served to eliminate the provisions of the prior constitution intended to have been "expunged" by amendment 40. Thus the remark of the committee made in June 1792 is not controlling of the interpretation of article 49 as approved in August 1792.

It is self-evident, that there was no intention under the constitution of 1792 to permit the president of the senate while "exercising" the office of governor to vote as a member of the senate, upon a measure which he might as Governor *pro tem* be called upon to either sign or veto, or if then vetoed, to thereafter vote in the senate, upon reconsideration as provided by part II, article 44, or article 45. It is our opinion that not every temporary absence of the Governor from the State would necessarily disqualify the president of the senate from "holding" his office as a member of the senate. If a vacancy in the chair of Governor which arises during a legislative session is occasioned only by brief or temporary absence of the Governor from the State, then the proscription imposed by article 49 would not necessarily come into play. When the president of the senate is required to act as Governor *pro tem* he may exercise ceremonial, routine, signatory, proclamatory, ministerial, and similar functions of the gubernatorial office, without losing his right to act as a member of the senate.

Subject to the foregoing exception, it is our opinion that the phrase of part II, article 49, "shall not hold his office in the senate", prevents the president of the senate from occupying his constitutional office of senator, and also his position as president of the senate, during the time that he "shall exercise the office of governor".

FRANK R. KENISON
LAURENCE I. DUNCAN
EDWARD J. LAMPRON
WILLIAM A. GRIMES
ROBERT F. GRIFFITH

Senate President Alf E. Jacobson, by Peter J. Cotch, administrative assistant to the senate president, and Senator C. Robertson Trowbridge, each filed a memorandum in support of an affirmative answer to the question whether the president of the senate is prohibited from holding only his office as president when acting as governor.