Carroll
No. 2008-750

JAMES BURKE & a.

v.

ARTHUR PIERRO & a.

Argued: September 10, 2009
Opinion Issued: December 16, 2009

*Orr & Reno, P.A.*, of Concord (*Emily G. Rice* and *Jeremy D. Eggleton* on the brief, and *Mr. Eggleton* orally), for the plaintiffs.

*Cooper Cargill Chant, P.A.*, of North Conway (*Randall F. Cooper* on the brief and orally), for the defendants.

CONBOY, J. The defendants, Arthur and Rose Pierro and Carmine and Maureen Pierro (Pierros), appeal an order of the Superior Court (*Fitzgerald*, J.) finding that the Pierros trespassed upon land owned by the plaintiffs, James and Patricia Burke (Burkes), and enjoining them from using the Burkes' beach for their recreational use. We affirm.

The record evidences the following facts. The Burkes own a home on Deer Cove Road in Ossipee, which overlooks Lake Ossipee. Their property includes a narrow strip of beach in front of their home on the other side of

Deer Cove Road bordering the lake. The Burkes' chain of title originates with Francis H. Lord (Francis Lord), who acquired title in 1871 to 120 acres of property in Ossipee bounded on the east by Lake Ossipee (known as "Deer Cove"). Between 1900 and 1909, Francis Lord conveyed thirteen parcels of land, including the Burkes' parcel, fronting the lake. The deed from Francis Lord to William Cowan, the Burkes' predecessor in title, specified conveyance of the property with "equal rights with others buying land of said grantor to the shore and shore road, to the spring point for water, and to use the roads to the Main road, not obstructing the view of said Lake nor the passage on said shore or road." All deeds to the Deer Cove lots fronting the lake contain similar "equal rights" language. In addition, Francis Lord conveyed two back lots from his remaining property, the deed to one of which contained similar "equal rights" language.

The deeds to the Pierros' lots, which are near, but not on, the lake, do not include the above-quoted "equal rights" language. The Pierros' lots are among a number of "back lots," located behind the beachfront lots, and originally conveyed by Francis Lord's son, Francis S. Lord (Frank Lord), who inherited his father's remaining interest in Deer Cove in 1912.

Since 1967, when they purchased one of the back lots containing a cottage, Arthur and Rose Pierro have used the beach in front of the Burkes' home. In 1980, they purchased two nearby back lots. In 1985, they conveyed one of those lots to Carmine and Maureen Pierro.

In 1983, the Town of Ossipee created a tax map, which designated the beach running along Deer Cove Road as Lot 49, a parcel distinct from the beachfront lots. Unable to identify the owner of the lot, the Town taxed Lot 49 to "owners unknown" for two years. In 1987, the Town's tax collector conveyed the parcel to the Town. The beachfront lot owners disputed the Town's ownership because they believed their deeds conveyed "equal rights" to use the beach. However, rather than challenge the Town's taking of Lot 49, the beachfront owners formed the Deer Cove Shorefront Owners' Association (DCSOA) for the purpose of taking title to the beach lot. In 1993, the Town conveyed the property to Florence Banfill, who immediately quitclaimed her interest in the beach lot to the DCSOA.

Certain back lot owners disputed Banfill's ownership of Lot 49, and brought a quiet title action against the DCSOA in 1996. The Pierros declined to participate in the lawsuit. In that action, the trial court found that: Banfill's deceased husband obtained title to Lot 49 in 1955; the Town properly acquired Lot 49 through tax deed in 1987; and the lot was properly conveyed to Banfill in 1993 and thereafter to the DCSOA.

In 1998, the DCSOA "surveyed" Lot 49 and quitclaimed to each beachfront property owner the beach area in front of the owner's property.

As a result, Donald Meader, the Burkes' predecessor in title, obtained ownership of the section of beach in front of his home.

In 2002, Meader commenced this action for trespass, and to permanently enjoin the Pierros from entering his property. He subsequently sold his property to the Burkes, who assumed Meader's position in this litigation. After a three-day bench trial, the trial court found there was no equitable servitude on the Burke property that permitted the Pierros to use the beach in front of the Burkes' home. The court also found that the Pierros failed to prove that they were entitled to a prescriptive easement. Accordingly, the trial court ruled that the Pierros had trespassed upon the Burkes' land and enjoined them from using the beach. The Pierros filed a motion to reconsider, which was denied. This appeal followed.

We will uphold a trial court's equitable order unless it constitutes an unsustainable exercise of discretion. *Blagbrough Family Realty Trust v. A & T Forest Prods.*, 155 N.H. 29, 46 (2007). Under this standard, we review only whether "the record establishes an objective basis sufficient to sustain the discretionary judgment made." *State v. Lambert*, 147 N.H. 295, 296 (2001). Unless a party establishes that such a ruling was clearly untenable or unreasonable to the prejudice of the party's case, it will not be disturbed. *Id.* "We review a trial court's application of law to facts *de novo*." *Blagbrough Trust*, 155 N.H. at 33. "We accord deference to the trial court's findings of historical fact, where those findings are supported by evidence in the record." *Id.*

The Pierros assert several theories in support of their claim that the beach lot is subject to an implied servitude that would allow them use of the beach for recreational purposes. They argue that Francis Lord and Frank Lord created a common scheme of development with access to a common beach lot for the benefit of all beachfront and back lot owners. They also argue that a servitude should be implied from prior use and based on necessity. Finally, in addition to their implied servitude arguments, the Pierros assert that they obtained a prescriptive right to use the beach.

We first turn to the Pierros' assertion of entitlement to an equitable servitude implied from a common scheme of development. "[A]n equitable servitude is a property interest in a burdened land, appurtenant to the benefited land," which rests on a determination that the original promisor and promisee intended to benefit a particular lot. *Traficante v. Pope*, 115 N.H. 356, 359 (1975). An equitable servitude may arise when a "general scheme of development . . . binds an owner who acquired the land with notice of a restriction on it." *Arnold v. Chandler*, 121 N.H. 130, 134 (1981) (quotation omitted). "If an original owner has adopted a general scheme for development or subdivision of a certain tract or parcel of land and has

inserted in his deeds of lots therefrom uniform restrictions intended by him and by the purchasers to be imposed on each lot for the benefit of all other lots included in the general plan, reciprocal servitudes are thereby created on all the lots in the development." *Bouley v. City of Nashua*, 106 N.H. 74, 77-78 (1964). Such intent to create a general scheme of development can be "ascertained from the language of the instruments, the conduct of the parties, and the surrounding circumstances." *Id.* at 78.

Here, the trial court found that Frank Lord, as successor to Francis Lord, did not continue a common scheme establishing a lake community with a common beach lot. It found, rather, that Frank Lord's conveyances constituted a separate development scheme that did not include beach access for the back lot owners. The trial court therefore concluded that the appurtenant easement benefits only the beachfront owners who purchased land from Francis Lord, not those whose lots were conveyed by his son, Frank Lord. We agree.

We begin our analysis by examining the language of the deeds. "The interpretation of deeds is ultimately for this court; however, our determination of the terms of a deed is based on the parties' intentions as properly found by the trial court." *Robbins v. Lake Ossipee Village, Inc.*, 118 N.H. 534, 536 (1978). "In construing the language of a deed, the finder of facts must place himself as nearly as possible in the position of the parties at the time of the conveyance and gather their intention in light of the surrounding circumstances." *Id.* at 536 (quotation omitted).

The trial court's finding that Francis Lord intended to create a servitude for the sole benefit of beachfront lot owners who purchased from him is amply supported by the record. The language in the deeds from Francis Lord referred only to "others buying land" from him. The deeds gave these specific lot owners "equal rights with others buying land of said grantor to the shore and shore road.? Nothing in this language indicates that Francis Lord intended to benefit anyone other than those to whom he conveyed property, which includes the beachfront lot owners and one back lot owner. Nor does the evidence in the record compel a finding that, absent such language in the deeds, Francis Lord intended to create a servitude to benefit any lot owners other than those who bought land from him.

To support their assertion that Francis Lord intended to create a servitude for the benefit of the back lots, the Pierros rely, in part, upon the fact that in the deed to one such lot, he included the same "equal rights" language as was contained in the beachfront lot deeds. The language in one back lot deed is insufficient to establish that Francis Lord intended all of the back lots to have the same rights as the beachfront lots. *See Sun Valley*

*etc., Co. v. Watts*, 98 N.H. 428, 433 (1954); *Carroll v. Schechter*, 112 N.H. 216, 219 (1972) ("[T]he mere fact that a grantor imposes restrictions in part of a tract of land which he is selling does not necessarily lead to the conclusion that he intended thereby to have the restrictions apply to his remaining land."); *cf. Varney v. Fletcher*, 106 N.H. 464, 466-67 (1965) (implying an equitable servitude where 100 lots were laid out on a series of recorded plans and all but the fifteen or eighteen lots still owned by the real estate developer were conveyed with the same restrictions).

Although the Pierros argue that the deeds from Frank Lord demonstrate his intent to expand his father's scheme for the benefit of the back lots, the deeds themselves contain no such language. Nor do the deeds from Frank Lord incorporate by reference his father's common scheme of development. *See Regan v. Hovanian*, 115 N.H. 40, 42-43 (1975) (holding that implied easement arose because each deed in chain of title referenced community plan); *McCleary v. Lourie*, 80 N.H. 389, 392 (1922) (where each deed specifically referenced plan, plan became essential part of each conveyance). Further, the Pierros fail to point to any surrounding circumstances or any conduct by Frank Lord or by those to whom he conveyed lots to demonstrate any intent that the back lots were subject to the same equitable servitude as the beachfront lots.

■■■ The Pierros next argue that they obtained an implied servitude under theories of prior use and necessity. *See* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES) §§ 2.12, 2.15 (2000). Implication by prior use concerns the use of benefited property before two or more parcels are severed.

> Unless a contrary intent is expressed or implied, the circumstances that *prior to a conveyance severing the ownership of land* into two or more parts, a use was made of one part for the benefit of another, implies that a servitude was created to continue the prior use if, *at the time of the severance*, the parties had reasonable grounds to expect that the conveyance would not terminate the right to continue the prior use.

*Id.* § 2.12, at 159 (emphasis added). Although the trial court made no specific findings regarding the prior use theory, it necessarily rejected the claim. "[I]n the absence of specific findings, a court is presumed to have made all findings necessary to support its decree." *Demers Nursing Home, Inc. v. R.C. Foss & Son, Inc.*, 122 N.H. 757, 761 (1982) (quotation omitted). We conclude that the court reasonably could have found that the prior use theory is inapplicable here because the record is devoid of any evidence demonstrating that the property that became the subject back lots included beach rights prior to severance by Francis Lord. *See Gulf Park Water Co.*

*v. First Ocean Springs Dev. Co.*, 530 So. 2d 1325, 1331 (Miss. 1988) (no easement based on prior use where evidence did not establish that use existed at time of severance of parcel ownership).

■ The Pierros also assert the necessity doctrine claiming that the failure to find an equitable servitude would "deprive the land conveyed . . . of rights necessary to reasonable enjoyment of the land in vicinity of the Beach Lot." *See* RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES), *supra* § 2.15. The necessity doctrine applies where the rights are necessary to the reasonable enjoyment of the property.

> "Necessary" rights are not limited to those essential to enjoyment of the property, but include those which are reasonably required to make effective use of the property. If the property cannot otherwise be used without disproportionate effort or expense, the rights are necessary within the meaning of this section. Reasonable enjoyment of the property means use of all the normally useable parts of the property for uses that would normally be made of that type of property.

RESTATEMENT (THIRD) OF PROPERTY (SERVITUDES), *supra* § 2.15 comment *d* at 207.

■ The degree of necessity required for an implied servitude exceeds that shown by the Pierros. *Compare United States v. 176.10 Acres of Land, More or Less*, 558 F. Supp. 1379, 1381-82 (D. Mass. 1983) (easement by necessity includes right to install utilities because electricity is necessary for modern residential use), *and Carr v. Barnett*, 580 S.W.2d 237, 240 (Ky. Ct. App. 1979) (easement by necessity implied where property could not be reached without crossing appellants' land), *with O'Buck v. Cottonwood Village Condominium Ass'n*, 750 P.2d 813, 819-20 (Alaska 1988) (no easement by necessity found for installation of television antenna) *and Drye v. Eagle Rock Ranch, Inc.*, 364 S.W.2d 196, 209 (Tex. 1962) (easements for pleasure and recreation over ranch were "novelty easements" and were not easements by necessity). Although the trial court did not make specific findings on this issue, we presume that the court found that the Pierros failed to demonstrate necessity sufficient to imply a servitude. *See Demers Nursing Home, Inc.*, 122 N.H. at 761. The record, which lacks any evidence of the Pierros' inability to use or enjoy their lots without "disproportionate effort or expense," amply supports this implied finding.

The Pierros finally argue that the trial court erred in finding that they lacked a prescriptive right to use the beach. They challenge the trial court's conclusions that: the Pierros' use was permissive; the tax deed and subsequent quitclaim conveyance from the Town to the DCSOA tolled the

prescriptive period; and Carmine Pierro's seasonal use of the property also tolled the prescriptive period. We uphold the trial court's determination that the Pierros did not have a prescriptive easement.

■■■ To obtain title by adverse possession, the claimants must show that they or their predecessors have achieved twenty years of "adverse, continuous, and uninterrupted" use of the land so "as to give notice to the [owner] that an adverse claim was being made to it." *Sleeper v. Hoban Family P'ship*, 157 N.H. 530, 536 (2008) (quotation omitted). The trial court found that the Town held title to the beach lot from 1985 to 1993, pursuant to RSA chapter 80, after the unknown owner of the lot failed to pay taxes. The Pierros assert that they used the beach from 1967 through 2002. In arguing that the Town's ownership and tax sale of the beach lot was irrelevant to their asserted twenty years of uninterrupted beach usage, the Pierros challenge the validity of the tax deed. However, their challenge is untimely pursuant to RSA 80:39 (2003), which states: "No action, suit or other proceeding shall be brought to contest the validity of a tax sale . . . after 10 years from the date of record of the collector's deed." *See Hudson v. Gate City Dev. Corp.*, 139 N.H. 606, 608 (1995) (rejecting a challenge to a tax deed for lack of notice years after expiration of the ten-year period, because the statute "makes no express exception for defects of any kind, jurisdictional or otherwise").

■■ Because the Pierros' challenge to the tax deed's validity fails, our decision in *Kellison v. McIsaac*, 131 N.H. 675, 681 (1989), applies here. In *Kellison*, we held that "a municipality holding title to land through tax foreclosure proceedings, without more, holds the property in a governmental capacity for public use, thereby preventing the running of the statute of limitations in an adverse possession case." Although we decided that a municipality's ownership interrupts the running of the statute of limitations, we did not determine the effect or scope of such interruption on the twenty-year prescriptive period. Consistent with established authority in this and other jurisdictions, we now hold that a municipality's title to land through tax foreclosure proceedings extinguishes the prescriptive period accumulated prior to a tax sale.

Courts are divided regarding "the effect of a tax sale and the nature or quantum of estate acquired by the purchaser." Annotation, *Quantum of Estate Acquired by Purchaser at Tax Sale of Property Which is Subject to Successive Estates or Different Interests*, 75 A.L.R. 416, 417 (1931) (quotations omitted). The majority view is that:

> [W]here the proceeding is strictly in rem, the title conveyed by a sale for nonpayment of taxes is not merely the title of the person who had been assessed for the taxes and had neglected to pay

them, but a new and paramount title to the land in fee simple absolute, created by an independent grant from the sovereign, and free from all equities and encumbrances existing prior to the sale upon the title of the previous owner. According to this view, the tax title is a breaking up of all titles, and operates not to support but to destroy them. It is a new and perfect title emanating from the state, and not merely the sum of old titles.

*Id.* (quotation omitted). An opposing *in personam* view posits "that the purchaser at the tax sale gets no better title than was held by the person assessed. According to this view, . . . the title is a derivative one, and the purchaser acquires only the apparent interest, whatever it is, of the tax delinquent." *Id.*

New Hampshire case law supports the view that a tax sale creates a "new and paramount title to the land in fee simple absolute." *Id.; see Smith v. Messer*, 17 N.H. 420, 428 (1845) ("No title can pass by a collector's deed under the statute, but an estate in fee-simple."); *see also Eastman v. Thayer*, 60 N.H. 408, 418 (1880) (one who receives a collector's deed acquires title to the land "devested of all other liens thereon or titles thereto"). Although our cases defining the scope of title interests acquired through a tax sale do not involve the interests of adverse possessors, the principles are applicable here. In *Spurgias v. Morrissette*, 109 N.H. 275, 278 (1969), we concluded that the issuance of a collector's deed terminates the previous owner's interest in the property. The taxpayer in *Spurgias*, divested of his property by a tax sale and a collector's deed, sought to recover the surplus proceeds the town received from the sale of the property at a public auction, less unpaid taxes, charges, and fees. *Id.* at 276. We concluded that any right of the taxpayer to the surplus proceeds resulting from the town's resale ended when the issuance of the collector's deed terminated the taxpayer's right of redemption. *Id.* at 278.

Similarly, in *First NH Bank v. Town of Windham*, 138 N.H. 319, 324 (1994), we held that mortgages recorded on a taxpayer's property do not survive the issuance of tax lien deeds after expiration of the right of redemption "because previous encumbrances are thereby divested." In finding that the tax lien is superior to the mortgage because it attaches to the land itself, we noted that the tax title derived from the lien "breaks up all previous titles." *First NH Bank*, 138 N.H. at 324. "[A] new and independent title to one hundred percent of the land charged for unpaid taxes is the ultimate product of the alternate tax lien procedure." *Id.*

Our conclusions in *Spurgias* and *First NH Bank* comport with the statutory scheme set forth in RSA chapter 80, which authorizes the issuance of tax lien deeds. The lienholder takes a "100 percent common and

undivided interest in the property" upon execution of the tax lien, RSA 80:61 (2003), and this interest matures into a tax title upon the termination of the taxpayer's right of redemption and the execution of the tax deed. RSA 80:76 (2003); *see also First NH Bank*, 138 N.H. at 324.

Our position regarding the status of tax titles arising out of tax sales is consistent with the majority view that properly acquired tax titles are new grants of title by the sovereign entity. For example, in *Lippert v. Jung*, 783 A.2d 206, 214 (Md. 2001), the Maryland Court of Appeals held that nineteen years of adverse possession prior to a tax sale and foreclosure proceeding did not count toward the twenty-year statutory period because the tax sale and foreclosure created a new title. Therefore, "[t]he title against which the . . . adverse possession was, at one time, running, no longer exists." *Id.* "In titles derived from valid and proper tax sales and foreclosure proceedings, in order for the inchoate adverse possession to ripen into actual title by adverse possession, the period of twenty years must run from the creation of the new title." *Id.*

The Supreme Court of Colorado employed a similar analysis in holding that title by adverse possession "vanish[ed]" upon issuance of a tax title and that "adverse possession prior to the creation of a tax title lends not the least support to the title claimed thereafter." *Harrison v. Everett*, 308 P.2d 216, 219 (Colo. 1957) (quotation omitted).

> The issuance of a valid treasurer's deed created a virgin title erasing all former interests in the land. When the treasurer issued his tax deed in conformity with law, he initiated a new title to the lands so conveyed. The former title is wiped out and a fortiori former liens and charges on such lands are removed. A tax title, from its very nature, has nothing to do with the previous chain of title; does not in any way connect itself with it. It is a breaking up of all previous titles. By a tax deed one acquires a new, independent and paramount title to the property.

*Id.* (quotations and citations omitted); *see Mills v. Deniston*, 299 S.W.2d 195, 196 (Ark. 1957); *Johnson v. Burgeson*, 170 P.2d 311, 312-13 (Wash. 1946).

In light of our own precedent and that of other jurisdictions, we adopt the majority view that the creation of a new title through a tax sale terminates the running of the statutory period in which adverse possession could ripen. The Pierros allege that they established their prescriptive rights from 1967 until 2003. However, the twenty-year prescriptive period was interrupted by conveyance to the Town by tax deed in 1985 and by the Town's ownership from 1985 to 1993. At most, the Pierros demonstrated

continuous use for only ten years after the tax sale. Because the Pierros failed to meet their burden of showing twenty years of uninterrupted use against the new title created by the tax deed, we need not address their other challenges to the trial court's findings.

*Affirmed.*

DALIANIS, DUGGAN and HICKS, JJ., concurred.