SMITH, et al. *v.* SMITH, et al.

Division B. Apr. 23, 1951.

No. 37940 (52 So. (2d) 1)

482

484

Brady & Roberts, and **Wells, Wells, Newman & Thomas,** for appellants.

W. W. Hewitt, N. W. Overstreet, Jr., V. J. Stricker, Jr., and Ernest Shelton, for appellees.

492

Hall, J.

On April 30, 1845, Elias Smith acquired the lands described as Lots 1, 2 and 3 in Section 33, Tp. 8, N., R 7 E. in Lincoln County. These lots lie North of the Choctaw Boundary Line, which is an irregular line beginning 726 feet South of the northeast corner of said

section and running in a general southwesterly direction to a point 3,960 feet South of the northwest corner of said section. The area North of the Choctaw Boundary is divided into the three lots mentioned, and the lines between these lots run due North and South. Lot 1 is in the East side of the section, is 2,640 feet wide measured from East to West, and contains 88 acres. Lot 2 lies immediately West of Lot 1, is 1,320 feet wide measured from East to West, and contains 85 acres. Lot 3 is immediately West of Lot 2, is 1,320 feet wide measured from East to West, extends to the West boundary of the section and contains 108 acres.

Elias Smith died intestate about 1846 and left as his sole and only heirs at law his widow, Emily Smith, and his son, Isham Smith, to whom said lands descended. In the years 1866 and 1870 said lands were divided between the two heirs of Elias Smith by a line mutually agreed upon between them, which line runs due North and South through Lot 2 so that there are approximately 46.5 acres East of the line in Lot 2 and approximately 38.5 acres West of the line. This line has thereafter been continuously referred to as the arbitration line. Lot 1 and all of Lot 2 East of this line became the property of Emily Smith; Lot 3 and all of Lot 2 West of the line became the property of Isham Smith. The land involved in this suit is that part of Lot 2 West of said arbitration line, and, while not exactly half of Lot 2, will hereinafter, for the sake of brevity, be referred to as the West half of Lot 2. A fence was built along the arbitration line so as to separate the property of Emily Smith from that of Isham Smith, and this fence has been kept in some sort of repair up to this time.

Isham Smith went into possession of Lot 3 and the West half of Lot 2 and lived in and reared his family in a house situated in Lot 2 near the western boundary thereof. He died intestate in 1915. Prior to his death he gave a deed of trust on Lot 3, which did not include any part of Lot 2. Default having been made in the

payment of the indebtedness thereby secured, this deed of trust was foreclosed on April 23, 1917, and Mrs. A. C. Seavey became the purchaser thereof. On October 5, 1917, Alexander Smith, one of the children of Isham, purchased Lot 3 from Mrs. Seavey and became the owner thereof. Alexander was living in the old home place at the time of his father's death and continued to occupy the same with two of his unmarried sisters; about 1925 one of his widowed sisters together with her children moved into the house with them, and all of them continued to occupy it until 1933 when they all moved to another place several miles away which had been provided for them by the widowed sister's son-in-law.

On November 27, 1929, Alexander Smith sold to his nephew Granberry Smith the North forty acres of Lot 3, it being described by metes and bounds. Granberry placed this forty acres under fence, but did not extend his fence upon any part of Lot 2. On November 21, 1930, Alexander sold the remainder of Lot 3 (except five acres on the South side not owned by him) to Granberry, and Granberry enclosed the same, but did not extend his fence upon any part of Lot 2. Granberry had Lot 3 assessed to himself and paid the taxes thereon but he never paid any part of the taxes on the West half of Lot 2 until the year 1943. In 1937 Granberry and wife executed an oil, gas and mineral lease on Lot 3 to F. H. Scott, which was shortly thereafter assigned to The California Company, one of the appellants herein, but no part of Lot 2 was included therein. On March 21, 1932, Granberry and wife sold an undivided one-half mineral interest as to Lot 3, but no part of Lot 2 was included in this sale.

On April 7, 1930, the West half of Lot 2 was sold to the State of Mississippi for the unpaid 1929 taxes thereon. On March 16, 1942, F. J. Hart filed an application with the State Land Commissioner for purchase of the West half of Lot 2. On May 13, 1942, Granberry Smith and wife executed to The California Company an instrument

whereby the description in his original lease of 1937 was changed so as to include the West half of Lot 2; this is the first instrument ever appearing of record showing that Granberry was making exclusive claim to any part of Lot 2. On June 30, 1942, F. J. Hart executed a quitclaim deed to Granberry and wife, and on August 5, 1942, the State issued a tax forfeited land patent to F. J. Hart; both of these instruments were filed for record on the same day. Subsequently the West half of Lot 2 was assessed to Granberry and he has paid the taxes thereon from 1943 to date.

On April 18, 1947, Granberry Smith and wife filed a bill of complaint against the State of Mississippi seeking confirmation of their tax title to the West half of Lot 2 as derived through the aforesaid tax sale, State patent, and deed from F. J. Hart; they alleged under oath that the title to said property had matured in the State of Mississippi by virtue of said tax sale, and that they had acquired the same pursuant to said patent from the State and quitclaim deed from Hart. Certified copies of the record of the tax sale and patent were exhibited with the bill. On May 24, 1937, upon oral and documentary evidence, they obtained a decree of the chancery court adjudicating the validity of said tax sale and of their title derived thereunder and confirming the same as against the State.

On May 24, 1948, Granberry Smith and wife, in consideration of love and affection for their children, conveyed to Brookhaven Bank & Trust Company, as trustee for the use and benefit of their children, an undivided 60/201 royalty interest in 201 acres of land, including the land in controversy.

On December 8, 1948, appellees as heirs of Isham Smith brought suit to cancel as clouds upon their title the claims of Granberry Smith and his wife and children and of The California Company to the West half of Lot 2 insofar as the same affect the undivided interests alleged to have been acquired by appellees by inheritance from

Isham Smith. It was alleged, among other things, that Bailey Smith, one of the children of Isham Smith, inherited an interest in the land in question and that upon his death on December 22, 1933, Granberry Smith as one of Bailey Smith's children inherited a portion of Bailey's interest and thereby became a tenant in common with the complainants. Appellants filed an answer and cross-bill raising certain defenses which will be hereinafter discussed. The case was tried by agreement before a special master whose final report was ratified and confirmed by the chancellor and a final decree was entered adjudicating the appellees to be the owners of an undivided 23/27ths interest in the land in question as tenants in common and cancelling as clouds upon their title to the extent of said interest the lease held by The California Company, the conveyance to Brookhaven Bank & Trust Company, as trustee, and the deed from F. J. Hart to Granberry Smith and wife. From that decree Granberry Smith and wife and children, Brookhaven Bank & Trust Company, as trustee for their children, and The California Company appeal.

 Appellants contend first that, while under the general rule a purchase by a cotenant of an outstanding title which was a common charge on the property when he became a cotenant inures for the benefit of other cotenants, such inurement does not occur where bona fide purchasers for value are involved or where long lapse of time occurs accompanied by inequitable circumstances such as to estop cotenants from asserting inurement. The specific application which appellants seek to make is that when Granberry Smith in 1929 and 1930 acquired Lot 3 from Alexander Smith they both thought that the West half of Lot 2 was included in the same sale, and prior to then that Alexander thought that he had acquired title to West half of Lot 2 by purchase from Mrs. Seavey; that the indebtedness secured by the deed of trust was a common charge on all the property, that Alexander merely extinguished the lien for the benefit

of all his cotenants, that they all had an interest in the property and are now estopped to assert it because of intervening bona fide purchasers and the long lapse of time. There are many reasons why this argument is untenable. The deed of trust which was foreclosed in 1917 was not a charge upon any part of Lot 2; it covered only Lot 3. Mrs. Seavey acquired no title to any part of Lot 2 and she did not purport to convey any part thereof to Alexander Smith; her conveyance of Lot 3 to him was several months after she had purchased it; there is nothing to show that either she or Alexander Smith thought that her conveyance covered any part of Lot 2, nor is there anything to suggest that when Alexander purchased Lot 3 he was as a matter of law merely redeeming it from the former lien thereon for the benefit of his cotenants. Mrs. Seavey had a good title to sell and, so far as the record shows, Alexander bought it in good faith and asserted full title until he sold Lot 3 to Granberry nearly thirteen years later. Granberry admittedly obtained a good title to Lot 3. Boyd v. Entrekin, 209 Miss. 51, 45 So. (2d) 848, and authorities therein cited. But neither Alexander nor Granberry acquired title to any part of Lot 2 by virtue of the foreclosure and purchase from Mrs. Seavey. The special master not only held this but made a finding that at the time Granberry acquired his deeds from Alexander he was familiar with the fact that the Isham Smith lands included not only Lot 3 but also the West half of Lot 2 and well knew that his deeds conveyed no part of Lot 2; that he had the land surveyed and established the true line between these two lots and erected a fence on the line so as to enclose what he had bought in Lot 3, thus negativing the claim that he thought he was buying also the West half of Lot 2. These findings are amply supported by the evidence, and were adopted by the chancellor.

Appellants suggest that Alexander could and probably did acquire title to the West half of Lot 2 by adverse possession, and that Granberry as his successor could

and did acquire title thereto by adverse possession. From 1915, when Isham Smith died, until 1933 when Alexander and his sisters moved from Lot 2, the possession of Alexander was in full recognition of the interests of his cotenants therein; there is no showing that he ever claimed it adversely to them; some of his cotenants were occupying it with him throughout this entire period, others were there a part of the time and he recognized their right to come and occupy the premises with him; he gave numerous deeds of trust on Lot 3 but never a lien on any part of Lot 2. As to the claim that Granberry acquired title to the West half of Lot 2 by adverse possession the special master found that he had been in possession from 1933 and making use of the land but that he did not at any time take any steps to put his cotenants on notice that he was claiming it as against their rights as heirs of Isham until 1942 when the amended description of the oil and gas lease to The California Company, and his deed from the grantee in the State patent were placed of record, and that title by adverse possession did not ripen in Granberry for the reason that after notice to his cotenants of his claim he did not hold for ten years prior to institution of this suit. This finding is supported by the evidence and was adopted by the chancellor.

 It is next contended that Granberry acquired title for the reason that it was thought and intended by all parties connected with the titles since 1911 and until 1942 that whenever the description "Lot 3" was used it was thought that the eastern boundary line thereof was the arbitration or fence line near the center of Lot 2, and that Lot 2 West of said line was inclosed with Lot 3 by a well-built, completely surrounding wire fence which was maintained to the date suit was filed herein. We are cited to no page or pages of the record nor can we find therein where there is any evidence to show that all persons connected with the title thought that Lot 2 West of the arbitration line was included in the description

"Lot 3". Likewise we are cited to no place nor are we able to find any in the record where there is any evidence that Lot 2 West of the arbitration line was inclosed with Lot 3 by a completely surrounding fence. On the contrary, we do find evidence, which was adopted by the special master as a finding of fact and approved by the chancellor, that when Granberry Smith bought the North 40 acres of Lot 3 he built a fence around it and did not run that fence onto any portion of Lot 2 but adhered strictly to the true line between Lots 2 and 3. We are most assuredly not authorized upon the record before us to overthrow the findings of the lower court in this respect.

In their answer to the original bill appellants pleaded and relied upon their title derived from the 1930 tax sale as being valid against appellees. In their answer to an amendment to the bill they stated that they are unable to state positively that said tax sale was a valid sale but they relied thereon by reaverring all the allegations contained in their original answer. They now vigorously attack the validity of the tax sale and contend that it was void. It should here be noted, as heretofore pointed out in the statement of facts, that when Granberry Smith and wife confirmed their title to the West half of Lot 2 in 1947 they alleged under oath the validity of the tax sale and patent and obtained from the court a decree establishing its validity insofar as the State of Mississippi is concerned. We pretermit a decision upon the defects alleged in the proceedings of the board of supervisors approving the assessment roll prior to the tax sale, and simply hold that appellants cannot change their contentions when it would seem advantageous to do so. In Standard Oil Company v. Crane, 199 Miss. 69, 84, 23 So. (2d) 297, 301, this Court said: "The sworn allegations of a bill by which a litigant seeks to move a court to its relief may not be lightly disavowed by affiant when, in another proceeding, its recitals rise to plague him in an inconsistent course. In-

deed, in the absence of special circumstances or explanation, a court has the right, if not the duty, to hold a litigant to the position which he takes in seeking its aid and, by assuming in his behalf utter good faith in the first instance, to reproduce such assumption later, even to his hurt. Certainly, insincerity or bad faith may never be pleaded in a tribunal which demands the contrary.'' Appellants say that the appellees herein were not defendants to their confirmation suit against the State, but we call attention to the fact that in the cited case the parties were not the same as in the prior proceeding therein referred to. We do not think that the appellants can ''blow hot'' in 1947 as to the validity of the tax sale, and then ''blow cold'' on the same proposition in the same court in 1949. They are estopped to question its validity under the facts here presented.

The tax sale in 1930 being valid, the title to the West half of Lot 2 then became vested in the State, and so remained until it issued its patent to Hart in 1942. During that period of time Granberry Smith could not claim adverse possession, and the statute thereon could not again begin to run until the land became the subject of private ownership. Cotten v. Cotten, 203 Miss. 316, 35 So. (2d) 61; Winstead v. Winstead, 204 Miss. 787, 38 So. (2d) 118. Granberry Smith's purchase of the tax title in 1942 was for the benefit of all his cotenants, Cohea v. Hemingway, 71 Miss. 22, 14 So. 734; Howard v. Wactor, Miss., 41 So. (2d) 259, not yet reported in the State Reports, and numerous authorities therein cited. The lower court having found that there was no actual notice to his cotenants of his adverse claim, he could not claim adversely to them until the constructive notice to them of his claim to the entire title as evidenced by the recordation in 1942 of his lease amendment to The California Company, and his deed from F. J. Hart purporting to convey to him the whole title. Peeples v. Boykin, 132 Miss. 359, 96 So. 177; Hurst v. J. M. Griffin

& Sons, 209 Miss. 382, 46 So. (2d) 440; Id., 47 So. (2d) 811.

In this case, however, it makes no difference whether the 1930 tax sale was or was not valid. Even if it were void and even if the statute on adverse possession was subject to be invoked by appellants, they are still faced with a finding by the trial court that there was no ouster or notice to the cotenants prior to 1942. This finding is amply supported by the record. The alleged invalidity of the tax sale therefore, even if true, would not change the result. It is contended by appellants, however, that Granberry Smith was not a cotenant when he first entered into possession. His father, a son of Isham, died December 22, 1933, and by inheritance Granberry thereupon became a cotenant with the appellees. The proof is not definite as to exactly when Granberry assumed possession of the West half of Lot 2. He claimed it was in 1930 but there was other evidence that it was as late as 1934. The lower court found that ''Granberry Smith had possession and control of the land in Lot 2 from 1933 to this date.'' We cannot say that this finding is erroneous or that it is not supported by the evidence. He was beyond question a cotenant after the death of his father and under the finding of the court he must have been a cotenant when he went into possession. However even if he had been a stranger when he entered into possession, such possession does not continue as if by a stranger so as to make it hostile after he became a cotenant. Freeman on Cotenancy and Partition, Section 243, citing Carpentier v. Mendenhall, 28 Cal. 484, 487.

It is further contended by appellants that since the tax sale occurred in 1930, prior to the time when he became a cotenant, his acquisition of the tax title in 1942 related back to the date of the tax sale and did not inure to the benefit of his cotenants. The only authorities cited to support this contention are some which are based solely upon the relationship of landlord and tenant and which hold that a tenant has the right to acquire an

outstanding claim adverse to his landlord which existed prior to creation of the relation of landlord and tenant. The reason for that holding is quite evident; the tenant may have put valuable improvements on the property or may have laid out a large investment looking toward the production of a crop on the premises and if the landlord's title was not good he had a right to acquire the outstanding claim for his own protection. The relation of cotenants, however, is entirely different. ██ They are in a position of trust and confidence toward each other and the rule is well established in this State and supported by the great weight of authority elsewhere that when one cotenant acquires an outstanding tax title it inures to the benefit of all the tenants in common. This means that the transaction is controlled by the time he acquired the tax title and not the time when the tax sale occurred.

It is next contended that appellees are barred by laches from maintaining their suit. In his tentative report the special master so held, but upon a consideration of the exceptions thereto and the Mississippi authorities on the subject he reversed himself and held in the final report that the defense of laches was not well taken, and this was the final decree of the chancellor. We have heretofore pointed out that there was no ouster of appellees and no constructive notice that Granberry was claiming the entire title to the land in controversy until the year 1942, and this suit was filed much less than ten years thereafter. Appellants can not claim adverse possession prior to 1942 and it is necessary for them to establish the same for a continuous period of ten years. ██ Laches has been defined as being not only a delay in asserting one's rights, but also such a delay as works a disadvantage to another. Comans v. Tapley, 101 Miss. 203, 57 So. 567. Here there has been no material change in the status of the parties, nor have any third parties acquired such rights as would make it inequitable for appellees to assert their rights. ██ Time is only

one element of laches; there must be some other element of change in the conditions and relations of the parties, or intervention of the rights of third persons to the extent that it would be inequitable to permit the party to assert his rights, and the question is addressed largely to the sound discretion of the chancellor whose decision will not be distrubed on appeal unless it is clearly erroneous and amounts to an abuse of discretion. Sample v. Romine, 193 Miss. 706, 8 So. (2d) 257, 9 So. (2d) 643, 10 So. (2d) 346. Moreover, no period of time, short of the bar of the statute of limitations, can be used as furnishing any laches which will constitute an equitable bar to the bringing of a suit. Lake v. Perry, 95 Miss. 550, 574, 49 So. 569; Hill v. Nash, 73 Miss. 849, 862, 19 So. 707; Johnson v. Carter, 193 Miss. 781, 787, 11 So. (2d) 196. █ █ Neither the three-year statute of limitations, Section 716, Code of 1942, nor the two-year statute of limitations, Section 717, Code of 1942, has any application to a tax-title claim by one cotenant against another. Howard v. Wactor, Miss., 41 So. (2d) 259, 261, not yet reported in the State Reports; Jonas v. Flanniken, 69 Miss. 577, 11 So. 319; McGee v. Holmes, 63 Miss. 50. Appellants must establish their claim under the ten-year statute, Code 1942, Section 711, before they can avail of any alleged laches as a defense to this suit, and this they have failed to do.

Appellants further contend that because of their defense of equitable estoppel the appellees should not prevail. "Estoppel must contain the following essential elements: Conduct and acts, language or silence, all amounting to representation or concealment of material facts. Furthermore, the facts must be known to the party estopped at the time of his conduct, or the circumstances must be such that knowledge of them is necessarily imputed to him, and their truth then unknown to the other party. The acts must be done with the intention or the expectation that the other party would act upon it, or under such circumstances that it would be both

natural and probable that he would do so; and reliance and action must be had upon it by the opposite party to his hurt." Peeler v. Hutson, 202 Miss. 837, 846, 32 So. (2d) 785, 787. Appellants have pointed out not one single act of estoppel by representation or concealment or by any act or language on the part of appellees. All that they claim is based upon mere silence. No cloud was put upon the title of appellees until 1942; apparently a representative of The California Company discovered that Granberry Smith had no title for it was he who first informed Granberry that Hart had applied for a patent and who requested him to go and see Hart and make a deal with him. ██ ██ The California Company either knew or had the means of knowing that Granberry had no title when it took the amended lease description in 1942 for it was a matter of record and it cannot claim to be an innocent purchaser for value without notice insofar as its lease is concerned. Howard v. Wactor, supra, and authorities therein cited. ██ ██ Certainly Brookhaven Bank & Trust Company, as trustee, and the beneficiaries of that trust were not innocent purchasers for value, for their trust conveyance was in consideration of love and affection. There is no showing that Granberry Smith has expended anything of consequence in putting improvements upon the land in excess of the benefits which he has derived therefrom. The California Company claims that it has expended over $100,000 in drilling an oil well on Lot 3, but none of that expenditure was made on any part of Lot 2 nor is there any showing that it would not have drilled that well even if there had been a lease in favor of some other company on Lot 2. ██ ██ There is not a single element of estoppel against appellees in this case. "Equity will not, on the mere ground of silence, relieve one who is perfectly acquainted with his rights, or has the means of becoming so. One should ordinarily inquire into the title before he undertakes to purchase land. He whose title is of record has given the notice which all are bound to

respect, and generally the law does not require more."
Roberts v. Bookout, 162 Miss. 676, 682-683, 139 So. 175,
176. We conclude, as did the trial court, that the defense
of estoppel in this case is without merit.

■■ Appellants contend lastly that the statute of
frauds as to trusts, Section 269, Code of 1942, and the
statute of limitations as to trusts, Section 746, Code of
1942, are applicable to this case. Section 269 requires
that all declarations or creations of trust or confidence
shall be in writing and signed by the party who creates
same. That part of the statute refers only to express
trusts; these must be in writing. Chichester v. Chichester,
209 Miss. 628, 48 So. (2d) 123. The latter part of the
statute applies to the principle, if it may be called a trust,
that the purchase of a tax title by one cotenant inures
to the benefit of all; it says "but where any trust shall
arise or result, by implication of law, out of a conveyance
of land, such trust or confidence shall be of the like force
and effect the same as . . . if this statute had not
been passed." The statute does not require that trusts
arising by operation of law shall be in writing, and the
principle with which we are here dealing does arise by
operation of law. ■■ Section 746 provides that a
bill for relief in the case of the existence of a trust, etc.,
shall be filed within ten years after the cause thereof
shall accrue and not after. This statute does not apply
because: (1) The bill in this case is not for relief upon
a trust, but is a suit to remove clouds from title; (2)
the suit was filed within less than ten years after
acquisition of the tax title by Granberry Smith. Con-
sequently Section 746 does not apply.

We are indebted to able counsel for both sides for the
thorough and painstaking briefs which they have pre-
pared in this case. We have given careful consideration
to all the questions raised and find no basis upon which
we would be authorized to reverse the decree of the lower
court. It is accordingly affirmed.

Affirmed.