783 A.2d 206

**Frederick W. LIPPERT et ux.,**

**v.**

**Barry S. JUNG.**

**No. 16, Sept. Term, 2001.**

Court of Appeals of Maryland.

Oct. 12, 2001.

**222**

Bruce A. Kent (Richard I. Martel, Jr., and Francis A. Pommett, III, on brief), Baltimore, for appellants.

William R. Levasseur, Jr. (Martin & Levasseur, on brief), Towson, for appellee.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, Judge.

In this very interesting case involving title to real property, Frederick and Ruth Lippert, appellants, claim title to the land in question by virtue of adverse possession allegedly extending for the statutory period. The unique aspect of this case is that almost nineteen years of the statutory period occurred prior to a tax sale of the premises at issue and a final order foreclosing the right of redemption, and the remaining portion of the statutory period occurred after the foreclosure of the

right of redemption. It is the appellants' position that the adverse possession of property continues and survives successive owners, even when the last owner achieved his title through a tax sale and has properly foreclosed the equity of redemption.

Barry S. Jung, appellee, the successor in interest to the purchasers at the tax sale, contends that the statutory period begins to run anew in respect to property that has been purchased at a tax sale where the equity of redemption has been properly foreclosed.

## I. Facts

In the mid–1970s, the Lipperts purchased a lot[1] in a subdivision in Baltimore County, Maryland. They mistakenly believed that the parcel they were buying also included two other, apparently abutting, lots. In addition to using the lot to which they had title, they also began to use the other two lots. The other two lots were eventually sold at a tax sale on May 16, 1991. On February 12, 1992, a proper judgment foreclosing all rights of redemption was entered.

The Lipperts apparently were not aware of the pendency of the tax sale, or of the proceedings to foreclose the equity of redemption. On May 13, 1998, slightly over six years after the judgment in the foreclosure proceeding was entered, appellee notified the appellants to remove various improvements from the property at issue here.

In response, and almost seven years after the redemption rights were foreclosed, appellants filed an action to quiet title to the property based upon adverse possession, claiming that the tax sale proceedings did not interrupt the running of the statutory period in which adverse possession can ripen into

---

1. Due to the strictly legal aspects of the controversy in the case at bar, we need not recite at any length such things as the descriptions of the property, notice, addresses, or generally, the elements of adverse possession. The sole issue is whether the tax sale of the property stopped the running of the statutory period. For the purposes of this case, there is no disagreement as to how long, or in what manner the Lipperts utilized the property, or similar matters.

title. They claim that the statutory period ripened on July 11, 1993, eighteen months after the judgment was entered foreclosing the right of redemption relating to the tax sale.

At a hearing on a Motion for Summary Judgment, the trial court found that the tax sale and foreclosure proceedings terminated the adverse possession period relying on the law of foreign jurisdictions. The appellee asserted below that:

"[APPELLEE'S COUNSEL]: ... Maryland is silent and it is surprisingly silent that this is an issue that has never presented itself especially in light of the age and the statute as far as adverse possession...."

The appellants, addressing the trial court's stated position based on the trial court's review of foreign law, stated to the trial court:

"[APPELLANTS' COUNSEL]: ... [Y]ou are saying they got closed out. It was closed out February 14, 1992. They have to start another twenty years at that time?

THE COURT: That's what the case law seems to say.

[APPELLANTS' COUNSEL]: Okay. That's not Maryland law as it is right now.

THE COURT: ... Maryland really hasn't addressed this question.... If you do not step forward [in the foreclosure proceedings], the title that the State is going to give is going to be against everybody.

. . .

... [E]verybody that needs to come forward that has a right, can come forward with a right. Because you didn't have a right, you had nothing. So, you still have nothing. You had nothing before in '92. You don't have anything now.

[APPELLANTS' COUNSEL]: But if on February 14 you are saying that you believe that on that date because the State passed title through a tax deed, everything stopped and we start all over again?

THE COURT: That's correct.

[APPELLANTS' COUNSEL]: ... I could not find any cases in Maryland about transfer of ownership of anything....

. . .

THE COURT: Well, what they are trying to do in the statute is they are trying to pass clear title. Therefore, everybody who has an interest has to come forward at that time. At that time Mr. Lippert did not have an interest as you indicated because he didn't have twenty years.

. . .

THE COURT: I believe they would have a right to come in and claim if they had twenty years at that particular time. Once they did not, then the title that is passed is clear.

. . .

[APPELLANTS' COUNSEL]: What you are saying is the statute stops everything?

THE COURT: That's correct."

Later, appellants' counsel states to the trial court:

"July 9, 1993, if the Jungs had walked in and said get off our property, that's it.... But they didn't. They didn't do nothing. Absolutely nothing.... I don't believe the statute can stop a right that wasn't there." [2]

The trial court then rendered summary judgment in favor of the appellees. Appellants appealed to the Court of Special Appeals. On our own action, by writ, we brought the proceedings before us for our review.

We note that appellants have framed the issue into a simple legal question:

Whether the 20 year time requirement under the doctrine of adverse possession is tolled by a tax sale of the real property?

---

2. A statute, as we discuss, *infra*, expressly deals with the running of adverse possession against a tax sale purchaser by a prior record owner subsequent to foreclosure.

## II. Standard of Review

In reviewing the grant of a summary judgment motion, we are most often concerned with whether a dispute of material fact exists. *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.*, 335 Md. 135, 144, 642 A.2d 219, 224 (1994); *Gross v. Sussex Inc.*, 332 Md. 247, 255, 630 A.2d 1156, 1160 (1993); *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737, 625 A.2d 1005, 1010 (1993); *Arnold Developer, Inc. v. Collins*, 318 Md. 259, 262, 567 A.2d 949, 951 (1990); *Bachmann v. Glazer & Glazer, Inc.*, 316 Md. 405, 408, 559 A.2d 365, 366 (1989); *King v. Bankerd*, 303 Md. 98, 110–11, 492 A.2d 608, 614–15 (1985) (citations omitted). "A material fact is a fact the resolution of which will somehow affect the outcome of the case." *King*, 303 Md. at 111, 492 A.2d at 614 (citing *Lynx, Inc. v. Ordnance Prods., Inc.*, 273 Md. 1, 8, 327 A.2d 502, 509 (1974)). "[A] dispute as to facts relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment." *Salisbury Beauty Schs. v. State Bd. of Cosmetologists*, 268 Md. 32, 40, 300 A.2d 367, 374 (1973).

This Court also has stated that "[t]he standard of review for a grant of summary judgment is whether the trial court was legally correct." *Goodwich v. Sinai Hosp. of Baltimore, Inc.*, 343 Md. 185, 204, 680 A.2d 1067, 1076 (1996); *see Murphy v. Merzbacher*, 346 Md. 525, 530–31, 697 A.2d 861, 864 (1997); *Hartford Ins. Co.*, 335 Md. at 144, 642 A.2d at 224; *Gross*, 332 Md. at 255, 630 A.2d at 1160; *Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 592, 578 A.2d 1202, 1206 (1990) (citations omitted). Thus, when there is no dispute of material fact, as in this case, our review is limited to whether the trial court was legally correct. With these considerations in mind, we turn to the case *sub judice*.

## III. Discussion

As we have indicated, for the purposes of appeal there are no material facts in dispute. The dispute is purely legal in nature—was the trial court legally correct in finding that the

tax sale and foreclosure proceedings terminated the adverse possession period?

Appellants argue that the trial judge ascribed to the majority view, but that Maryland follows, or should follow, the minority view. Appellants' position, the minority view in other jurisdictions, is that a purchaser at a properly conducted tax sale acquires only the interest of the defaulting taxpayer/property owner, and that the interest acquired through the tax sale is thus subject to any inchoate interests then being perfected, such as the inchoate interests of an adverse possessor. Appellee, not surprisingly, argues that the trial court was correct.

Appellants argue that there is no Maryland case law on point. Appellee does not argue to the contrary. Both are, for the most part, wrong. It is true that there is no adverse possession case in respect to the title passed by Maryland's tax sale procedure. There is, however, a body of Maryland law, none of which was cited by either party, in which this Court, and most recently the Court of Special Appeals relying on our previous line of cases, has defined the scope of the title interests acquired through a proper tax sale and foreclosure of right of redemption proceedings. This line of cases supports the decision of the trial judge, albeit he also did not rely on those cases.

■ The Court of Special Appeals, citing to our cases, which we will discuss, *infra*, in *Bell v. Myers*, 28 Md.App. 339, 343, 345 A.2d 105, 108 (1975), in reversing the trial court, stated:

"The crux of the chancellor's holding is that the purchaser *at a tax sale* acquires no better title than was held by the person assessed. This is indeed the law in some jurisdictions but, unfortunately for the appellees, it is not the law in Maryland. In 75 A.L.R. 416, at 417, the commentator states 'There are two opposing theories as to the effect of a tax sale and the nature or quantum of estate acquired by the purchaser'. One theory is that pronounced by the chancellor. The other theory, espoused by decisions of the Court of Appeals, is that:

'. . . [I]f the tax deed and the proceedings upon which it is based are valid, it clothes the purchaser not merely with the title of the person who was assessed with the taxes, but with a new and complete title in the land, under an independent grant from the sovereign authority, *which bars or extinguishes all prior titles, interests, and encumbrances of private persons, and all equities arising out of the same* '. 75 A.L.R. 416, 418."

That court went on to discuss our cases in support of its holdings. They are a line of older, but still viable, cases that we discuss more at length, *infra.* We have not discovered in our research, any Maryland tax sale cases specifically involving the inchoate interests of adverse possessors; however, the principles of our cases control in such instances.[3]

█ It must be remembered that although tax sales are concerned with the payment of taxes on land, the issue in most tax sale cases, where the equity of redemption has been properly foreclosed, is almost always a matter of title. It

---

**3.** While we have found no tax sale cases in which non-owners in adverse possession have attempted to maintain continuity of adverse possession after a valid tax sale in order to reach the statutory period of twenty years, there is an old case, albeit with different circumstances, and, accordingly, not exactly on point, where such a non-owner adverse user attempted to assert continuity of adverse possession, after a valid judicial sale, in order to claim title by adverse possession. We rejected that attempt in *Saunders v. Clark*, 128 Md. 115, 120, 97 A. 136, 137 (1916), where we said:

"It is further urged on behalf of the plaintiffs that the land in controversy, having been in the exclusive and continuous occupancy of themselves and of, their parents under whom they claim as heirs at law, for more than twenty years, they have acquired a valid title by adverse possession. To dispose of this contention it is only necessary to refer to the fact that all the persons interested in the property were made parties to the creditor's suit instituted in 1899. The decree and ratified sale in that proceeding were effectual and conclusive in transferring to the purchaser all their right, title and interest. The subsequent possession of the property, by some of the parties to that cause, has, of course, not been of such duration as to imply a title by prescription.... The ratification of the sale invested the purchaser with the substantial ownership of the land, and as against the title granted by his deed, and the actual possession obtained for value by his grantee, the plaintiffs have no subsisting interest upon which the relief they seek in this suit can be predicated." [Citation omitted.]

remains our view, and it is the holding of our cases, that a valid tax sale and proper foreclosure of the equities of redemption terminates the prior title, and creates a new title granted by the sovereign. Accordingly, the new title cannot be adversely possessed until the statutory period runs from the time of the creation of the new title (although, as we note later, there is a special adverse possession statute that affords some limited prospective rights to prior record holders that remain in possession after the foreclosure proceedings).

Initially, we note that Maryland Code (1985, 2001 Repl.Vol.), section 14–832 of the Tax–Property Article, "Construction of sections," provides in relevant part:

"The provisions . . . shall be liberally construed as remedial legislation to encourage the foreclosure of rights of redemption by suits in the circuit courts and for the decreeing of marketable titles to property sold by the collector." [4]

We said in *Thomas v. Kolker*, 195 Md. 470, 475, 73 A.2d 886, 888 (1950):

"In other words, the legislature has declared that the public interest in marketable titles to property purchased at tax sales outweighs considerations of individual hardship in every case, except upon a showing of lack of jurisdiction or fraud in the conduct of the foreclosure."

See *Hardisty v. Kay*, 268 Md. 202, 208, 299 A.2d 771, 774 (1973); *Kaylor v. Wilson*, 260 Md. 707, 712, 273 A.2d 185, 187 (1971).

Actions arising out of tax sales, as well as actions to clear clouds on title, are *in rem* or *quasi in rem* actions. See *Sanchez v. James*, 209 Md. 266, 270, 120 A.2d 836, 837 (1956), where, referring to *Leigh v. Green*, 193 U.S. 79, 90, 24 S.Ct. 390, 393, 48 L.Ed. 623, 628 (1904), we noted:

"In that case Justice Day, delivering the opinion of the Court, pointed out that tax foreclosure proceedings are not actually proceedings against parties, but the statute under-

---

4.. Similar provisions were contained in prior versions of the Article.

takes to proceed *in rem* by making the real estate answer for the public dues, and the primary object of the statute is to reach the real estate which has been assessed."

As such, generally, tax sales, so long as they are properly conducted, relate to titles to land, as opposed to rights of persons in possession of land when such rights have not ripened into title interests.[5] In *James v. Zantzinger*, 202 Md. 109, 115–16, 96 A.2d 10, 13 (1953), Zantzinger had purchased property from the owner of the record title, but forgot to record the deed. After he had purchased the property, but before he obtained a deed, the property was sold at a tax sale and the equity of redemption was foreclosed by the tax sale purchaser. Zantzinger argued on appeal that he should have received notice of the pendency of the action to foreclose the right of redemption. The Court said:

"However, in this case appellant was not under any legal or equitable duty to notify any persons who were not shown by the land records to have any interest in the property purchased at the tax sale. Code 1951, art. 81, sec. 101.

... More than a year and a half after the tax sale, and more than six months after the institution of the suit to foreclose the right of redemption, Zantzinger received a deed for the property from Jacoby [the record owner], but he failed to record it. More than a year elapsed between the time of the institution of the suit and the final decree vesting absolute and indefeasible title in the [tax sale] purchaser. And yet Zantzinger took no action until nearly four months after the decree was entered.

. . .

... Courts of equity do not restore opportunities which have been permitted to pass by reason of the neglect of those to whom the opportunities were once presented. This

---

5. Statutory protections have been afforded certain persons in possession, such as tenants, but these protections relate to proper notice and other procedural protections. At one time, there was a statutory procedural protection afforded certain adverse users in Prince George's County.

is especially true in this case, since the Legislature has prescribed how and when a purchaser may obtain an absolute and indefeasible title to property which he has purchased at a tax sale. . . . It is the mandate of the Legislature that the decree foreclosing the right of redemption is final and conclusive and must not be set aside except for lack of jurisdiction or for fraud."

In the present case, appellants make no claim that the trial court lacked jurisdiction or that a fraud occurred, nor do they attack the validity of the sale. In essence, they ask this Court to ignore the sale and the absolute and indefeasible title such sales, with their subsequent foreclosure proceedings, produce. Appellants are essentially arguing that the adverse possession method of obtaining title overrides or survives the statutory creation of new title in land, even when the period necessary to create title by adverse possession has not elapsed at the time of the foreclosure of the equity of redemption arising out of the tax sale. In other words, appellants' argument is that the possibility of future title through adverse possession defeats the creation of an absolute and indefeasible title created at the time of the entry of a judgment foreclosing the equity of redemption, even where there is no impropriety in the sale or foreclosure proceedings. The argument almost answers itself. This is especially so when the status of the title that evolves from the tax sale procedures is considered.

We reiterated what we had said in earlier cases in *Winter v. O'Neill,* 155 Md. 624, 631, 142 A. 263, 266 (1928):

"[Y]et if the tax deed and the proceedings upon which it is based are valid, then from the time of its delivery it clothes the purchaser not merely with the title of the person who had been assessed for the taxes and had neglected to pay them, but with a new and complete title in the land, under an independent grant from the sovereign authority, which bars or extinguishes all prior titles and encumbrances of private persons, and all equities arising out of them. It requires no argument to demonstrate that, when a governmental agency is empowered to levy taxes for the purpose

of producing revenue for the support of the government, it is necessary that a method be provided by which the payment thereof may be enforced. When this method is sale at public auction to the highest bidder, it is essential, in order that there may be bidders at such sale, that the purchaser's title be protected, in cases where the statutory essentials of the sale are substantially complied with; otherwise the collection of taxes would be seriously impaired." [6] [Citations omitted.]

*See also Thompson v. Henderson,* 155 Md. 665, 667, 142 A. 525, 526 (1928).

We had held twenty-two years before the *Winter* case, almost a hundred years ago, in *Hill v. Williams,* 104 Md. 595, 604, 65 A. 413, 414–15 (1906), where it was argued that an easement on property was not extinguished by a tax sale, that:

"[A]nd if the taxes were not paid it was liable to be sold, even though by such a sale the easement would be destroyed; because the purchaser at a tax sale, when the proceedings are regular, *is clothed with a new and complete title in the land, under an independent grant from the sovereign authority,* which bars or extinguishes all titles and encumbrances of private persons, and all equities arising out of them. These observations dispose of the three objections first mentioned...." [7] [Citation omitted.] [Emphasis added.]

---

**6.** Over the years, there have been several modifications to the tax sale provisions. None have altered the basic character of the new titles that result from tax sales.

**7.** The Court of Special Appeals in *Monumental Enterprises, Inc. v. Mayor & City Council of Baltimore City,* 26 Md.App. 24, 38, 337 A.2d 176, 185 (1975), in dicta, stated without reference to our holding in *Hill, supra,* "if there are binding easements on the subject tract running with the land, ... (Monumental) would have been powerless to destroy them. Nor would the tax sale successor have acquired such power as a result of a foreclosure decree. On the other hand, if the easements did not run with the land, they would have been foreclosed by the final foreclosure decree." As we indicate elsewhere, current statutes require notice of the foreclosure action to be given all record holders of interests in property purchased at tax sales.

We noted under the law that existed over a hundred years ago, that when a life-tenant fails to pay taxes, and the taxes are assessed under the life-tenant's name, the deed arising out of a tax sale properly conducted, conveys *fee simple title, including the remainder interest.   Cooper v. Holmes,* 71 Md. 20, 30, 17 A. 711, 713 (1889).  Thus, our older cases, under the law then existing,[8] held that even vested interests, *i.e.,* easements as in *Hill* and vested remainder interests as in *Cooper,* were extinguished by a validly conducted tax sale and foreclosure proceedings.

We repeated the same principle in *McMahon v. Crean,* 109 Md. 652, 665, 71 A. 995, 997 (1909), where we said:

"In *Hefner v. The Insurance Company, supra,*[9] it is said: 'If the tax deed is valid, then from the time of its delivery it clothes the purchaser, not merely with the title of the person who had been assessed for the taxes and had neglected to pay them, but with a new and complete title ... from the sovereign authority, which bars and extinguishes all prior titles and encumbrances of private persons, and all equities arising out of them." [Citations omitted.]

*See Wagner v. Goodrich,* 148 Md. 318, 323, 129 A. 364, 365 (1925) ("[A]s the sale appears to have been valid, the grantee

---

**8.**   Current statutes require notice of foreclosure proceedings to persons that can be identified from a proper title search of the land records. Remainder interests would generally, if not always, be disclosed by such a properly conducted title examination.   Recorded easements would also be identifiable through the land records, although the persons who have rights in the easements might have to be identified through title examinations of the dominant tracts.   Maryland Code (1985, 2001 Repl.Vol.), section 14–836 of the Tax Property Article contains a listing of additional parties entitled to notice, including known tenants or tenants whose interests are reasonably ascertainable, lien and judgment holders of record and others.   After the change in the statute, we specifically held that remainder persons of record were entitled to notice of the proceedings to foreclose the equity of redemption.   *See Brashears v. Collison,* 207 Md. 339, 115 A.2d 289 (1955).   The mention of interests, if any, of persons in past adverse possession (and we perceive of no choate title interests in adverse possessors prior to the running of the statutory period), are, except for the one exception we discuss, *infra,* conspicuously absent in the statutes.

**9.**   123 U.S. 747, 751, 8 S.Ct. 337, 338, 31 L.Ed. 309, 311 (1887).

in the tax deed became invested with 'a new and complete title in the land, under an independent grant from the sovereign authority.' "); *see also Textor v. Shipley,* 86 Md. 424, 438–39, 38 A. 932, 933 (1897). In *LaValley v. Rock Point,* 104 Md.App. 123, 127, 655 A.2d 60, 62 (1995), the Court of Special Appeals stated: "Indeed, an owner retains his right of redemption until it has been 'finally foreclosed' by the trial court. If an owner fails to redeem, the purchaser acquires absolute title to the property." (Citations omitted.)

Adverse possession of land in respect to ownership or rights in the land is a concept of title. In other words, if one adversely possesses land for the requisite time, the character of the land is not changed. Whatever its character, the land remains the same. What the adverse user achieves is title to the land-ownership. Accordingly, the nineteen years of adverse possession in the case at bar related to the prior title to the property. That title was extinguished by the creation of a new title to the identical land through the tax sale and foreclosure proceeding, before the possession adverse to the prior title ripened. The title against which the Lipperts' adverse possession was, at one time, running, no longer exists. It is gone.

The appellee holds a completely new title. This title has only existed since 1992. It cannot be said that adverse possession can run against a title that is not in existence, and that, in the absence of proper proceedings, may never exist. In titles derived from valid and proper tax sales and foreclosure proceedings, in order for the inchoate adverse possession to ripen into actual title by adverse possession, the period of twenty years must run from the creation of the new title.[10]

Additionally, it cannot be said that the Legislature was unaware of the method of obtaining title to land through adverse possession. In respect to adverse possession, it provided, in one instance, a limited right of adverse possession

---

10. We emphasize again that the validity of the sale and foreclosure are not at issue in this case.

with a shortened period. This special right of adverse possession applies only to the prior record owners and certain successors, whose title is terminated through a tax sale process. Maryland Code (1985, 2001 Repl.Vol.), section 14–852 of the Tax–Property Article provides in relevant part:

"When land is sold to pay county or State taxes, or both, . . . and the owner of the land at the time of the tax sale, the owner's heirs, . . . have held the land sold in adverse possession for 7 years *after* the final ratification of the tax sale and before action or suit is brought, and prosecuted by the purchaser at the tax sale, . . . to obtain possession, . . . the [adverse] possession is a bar to all right, title, claim, interest, estate, demand, right of entry, and right of action of the purchaser . . . derived from the tax sale as to the land held in possession." [Emphasis added.]

*See also White v. Hardisty,* 220 Md. 152, 151 A.2d 764 (1959) (discussing a prior but similar statute that apparently applied only in Prince George's County).

The language of the above section would appear to apply in those situations where the person whose rights are sold at the tax sale remains in possession for a period of seven years, after the final order foreclosing the right of redemption. (The Tax Property Article contains no section that speaks to "ratification." It refers to "Final order" and describes it as the foreclosure of rights of redemption). A purchaser at a tax sale or his assigns has to move by way of ejectment or other appropriate action to dispossess the former owner who has remained in possession subsequent to the sale within seven years. If not, the former owner of record may, in seven years, not twenty years, obtain title by adverse possession to the same land he formerly owned. In the present case, appellants were never record owners. Their prior adverse possession had not been twenty years in duration, so at the time of the tax sale they were not owners. Had they been owners of record, this provision, if the appropriate facts existed, might have been applicable.

In any event, it is clear that the Legislature was aware of the concept of the acquisition of title by adverse possession as it addressed the issue in the context of tax sales, although not in the context of the issue presented in this case. Had the Legislature chosen to permit the prior continuation of adverse use to survive the new title obtained through a tax sale, it might have been able to so. It did not, and we will not.

The history of land titles in Maryland supports our cases. Originally, the Lord Proprietors, the original grantees of the English kings, were granted and seized of title to land in the new world.[11] *Patton on Land Titles* states that:

"Even allodial [12] titles, which are the only kind existing in the United States, begin with a grant from the sovereign state. The term does not refer to any of the Indian tribes or nations originally in possession of the land under a form of civilization not recognized by international law as conferring sovereign rights. Instead, it relates to the federal government, the states comprising it, and to the European nations which acquired the absolute ultimate title by discovery 'subject only to the Indian title of occupancy.' ...

. . .

... In some of the original states, title to all of the land, and in others, to a large part of it, depends upon royal grant from the King of England. Some of these were direct grants such as that of King Charles II, ... the grant of Pennsylvania and Maryland by the same monarch to William Penn, and the grant of Maryland to Lord Baltimore....

. . .

---

**11.** The fact that the kings may not have possessed the property in the first instance is an issue we need not address in this opinion. They granted it and thus began the concept of title, at least in the new world's original colonies.

**12.** Allodial is land "held in absolute ownership; pertaining to an allodium." Allodium is "an estate held in fee simple absolute." *Black's Law Dictionary* 76 (Bryan A. Garner, ed., 7th ed., West 1999).

... In the proprietary and charter governments the land had already been granted ... and private title begins with a grant from them."

Rufford G. Patton and Carroll G. Patton, *Patton on Land Titles* Volume 2 p. 2–12 (2d ed.1957). *Patton,* referring to Maryland, states:

"The lands thus granted were given with full and absolute license, power and authority....

At the time of the Declaration of Independence, most of the lands ... had been granted ... to individuals or corporations by deeds which vested them with full powers of ownership ... none of these rights were affected by the establishment ... and the change of sovereignty effected thereby. Those lands which had not been granted ..., together with the confiscated lands, became the property of the new state." [13]

*Id.* at 91 n. 21. The original grant to Lord Baltimore, as relevant to titles, provided:

WHEREAS Our right Trufty and Wellbeloved Subject, *Cecilius Calvert,* Baron of *Baltemore* in our Kingdom of *Ireland* ... hath humbly besought our Royall Majesty to give, grant, and confirme all the said Countrey, with certaine Priviledges and ..., requisite for good government....

KNOW YEE therefore, that Wee ... have given, granted, and confirmed, and by this our present Charter, ... doe give, grant ... all that part of....

WEE DOE also grant ... unto ... Lord *Baltemore* ... all lands ... [a]nd all Soile, lands, Fields, Woods, Mountaines,

---

**13.** Patton here refers to the land that the Lord Proprietors had failed to grant prior to the Revolution, and to lands confiscated from Tories or other Loyalists as a result of the Revolution. These ungranted and confiscated lands have subsequently been subject to conveyance by purchase, patent, or otherwise by the State. In any event, in Maryland, the State (and in certain cases perhaps the federal government) and its predecessors are the source of all private title to lands.

Fennes, Lakes, Rivers, Bayes, and Inletts.... *Together with* all and singular the like, and as ample rights....

. . .

NOW THAT the said Countrey thus by Vs granted ... may be eminent ... Wee doe ... incorporate them into a Province, and doe call it *Mary land,* and so from henceforth will have it called.

. . .

AND FURTHER ... Wee have given granted, and confirmed, and by these Presents for Vs, Our Heires and Successors, doe give, grant, and confirme unto the said now Lord *Baltemore* ... full and absolute license, power, and authoritie, ... from time to time hereafter for ever, at his, or their will, and pleasure, may assign, aliene, grant, demise, or enfeoffe of the Premises to many, and such parts and Parcells, to him or them that shall be willing to purchase the same, as they shall thinke fit, TO HAVE and to hold to them the sayd person, or persons, willing to take or purchase the same, their heires and assignes in fee simple, or fee taile, or for terme of life, or lives, or yeeres, to bee held of the said now Lord *Baltemore,* his heires, and assignes, of such services, customes, and rents, as shall seeme fit to the said now Lord *Baltemore* ...."

The Charter of Maryland, June 20, 1632, Reproduced—Maryland Hall of Records Commission—1982.

As can be seen, the Lord Proprietors received their title from the English Kings, along with the right to, in turn, grant the lands to others. The Lord Proprietors granted the rights to much of the land, and title to it, to the immigrants of colonial days, mostly European/Americans, subject to certain conditions such as the annual or periodic payment of hogsheads of tobacco, or of other specie. During and after the Revolution, the Lord Proprietor's interests were, in essence, nationalized and "statelized" for the benefit of the victors of the War. Through the relationship between the states and the federal government in the post-revolutionary era, the Lord Proprietor's successors, the states, became vested with the

right to grant and patent titles to land to the citizens, a process that continues. The grants and patents are subject to the requirement that the created title to property be subject to charges on the land and that the title owners, and their successors, pay such taxes or charges on the land so granted, as the states from time to time, deem necessary for the proper functioning of government. The land itself is subject to taxes. If the taxes are not paid, the title to the land through the tax sale process is granted and titled anew to the tax sale purchaser.

A comparison with foreign cases strongly indicates that Maryland's position is consistent with the majority view found to apply by the trial court. In reversing a lower court's finding that adverse possession continued to run and survived a tax sale, the Supreme Court of Colorado, in *Harrison v. Everett*, 135 Colo. 55, 60–61, 308 P.2d 216, 219 (1957), stated in relevant part:

> "The issuance of a valid treasurer's deed created a virgin title erasing all former interests in the land. 'When the treasurer issued his tax deed in conformity with law, he initiated a new title to the lands so conveyed. The former title is wiped out and a fortiori former liens and charges on such lands are removed.' ' "A tax title, from its very nature, has nothing to do with the previous chain of title; does not in any way connect itself with it. It is a breaking up of all previous titles." ' By a tax deed one acquires 'a new, independent and paramount title to the property.'

> Title by adverse possession vanishes when the treasurer issues his deed in accordance with law for unpaid taxes. 'The title by adverse possession thus disclosed against the original owner of the land disappeared when the land was sold for taxes under which the purchaser obtained the land free from the appellee's claim thereto.' 'Clearly adverse possession prior to the creation of a tax title lends not the least support to the title claimed thereafter.'

In order to start anew a prescriptive title, the Lowrys must have proven an adverse possession commencing with the 29th day of January 1945, the date on which the

property was conveyed by Chaffee County to Solomon Grodal." [Citations omitted.]

*See also Johnson v. Burgeson,* 25 Wash.2d 269, 271, 170 P.2d 311, 312–13 (1946) ("The regular foreclosure of a[tax] lien ... has, ... all the force of a proceeding *in rem,* and vests in a purchaser ... a new title independent of all previous titles or claims of title to the property. Manifestly, both record and possessory titles are equally absolutely destroyed.... Clearly, adverse possession prior to the creation of a tax title lends not the least support to the title claimed thereafter.") (Citations omitted.); *Gustaveson v. Dwyer,* 78 Wash. 336, 338, 139 P. 194, 195 (1914) ("[I]n no event, could appellant's possession existing prior to the tax sale to the county on August 23, 1902, however exclusive or adverse the possession may have been, in the least impair the tax title of the county then acquired or the title of its grantees, after that date."); *Mills v. Deniston,* 227 Ark. 463, 466, 299 S.W.2d 195, 196 (1957) (" '[A] valid tax sale transfers, not only the title of the person in whose name the land was assessed for taxes, but the interests of all others therein.' "); *see also Ayers v. Day and Night Fuel Co.,* 451 P.2d 579 (Alaska 1969).

In *Borisenok v. Hug,* 212 A.D.2d 282, 283–84, 630 N.Y.S.2d 122, 122–23 (1995), that court noted:

"Plaintiffs contend that because they acquired valid title to the property at issue through adverse possession prior to the tax foreclosure sale, Saratoga County could not pass to defendants, by virtue of the tax sale, any greater title than it had in the property prior to the tax foreclosure. In rejecting this argument, we initially note that the title conveyed in a tax sale is not simply the title of the delinquent property owner. Rather, as the Court of Appeals has noted, '[t]he purchaser of property at a tax sale ... acquires a new and complete title to the land under an independent grant from the sovereign, a title free of any prior claims to the property or interests in it.'

. . .

... Plaintiffs contend that their situation can be distinguished from the Court of Appeals holding in *Congregation Yetev Lev D'Satmar v. County of Sullivan (supra)*[, 59 N.Y.2d 418, 465 N.Y.S.2d 879, 452 N.E.2d 1207 (1983)]. It is true that the specific issue in that case was whether the party claiming title by adverse possession had received adequate notice.... Implicit in the Court's ruling is that the adverse possessor's title did not survive the tax sale." [Citations omitted.]

In the Mississippi case of *Cotten v. Cotten*, 203 Miss. 316, 321–22, 35 So.2d 61, 63 (1948), the Court recognized that there might be a difference as to the interruption of the statutory period where the right of redemption has not been foreclosed, an issue we need not reach in the instant case, when it opined as dicta:

"It is conceded ... that there is no previous decision of this Court expressly holding that [a tax sale] has the effect of breaking the continuity of adverse possession where the claimant on such ground continues in possession, but the case of *Douglas et al. v. Skelly Oil Company et al.*, 201 Miss. 23, 28 So.2d 227, 230, is cited holding that: 'Moreover, the contention of appellants to the effect that a sale to the State for taxes during two of the years in question had the effect of interrupting the possession is not well taken for the reason that each of the said tax sales were redeemed within the time required by law.... In the instant case, the title of the State had matured for failure to redeem, and the statute of limitation could not again begin to run until the land became subject of private ownership in 1938, less than ten years prior to the filing of this suit.' " [Emphasis deleted.]

As we have indicated above, in the present case, there has been a foreclosure of the right of redemption, and title has been conveyed to appellees by proper deed.

Other courts are in concurrence. *See Trailwoods Home-owners' Association v. Scott*, 938 S.W.2d 669, 670 (Mo.App. 1997) ("However, 'title by adverse possession is not a defense to a suit for delinquent taxes, ... or in itself a reason for

setting aside a tax sale.' Plaintiff's title by adverse possession is not superior to defendant's title....") (Citation omitted.); *Hughes v. Price,* 229 S.W.2d 79, 80 (Tex.Civ.App.1950) (Where a person asserting an adverse possession claim was not even permitted to redeem the property sold at tax sale, "Inasmuch as appellant did not own the land or any interest therein at the time of the sale for taxes, or even thereafter, it is our opinion that the trial court properly held that appellant had not met the requirements of the law as provided for in such cases.") (There was no attempt to redeem by the appellants in the case *sub judice* ).

Finally, there is a case from our neighboring jurisdiction. In *Torch v. Constantino,* 227 Pa.Super. 427, 430–33, 323 A.2d 278, 279–81 (1974), the court stated:

"Thus, the question before us is whether land held for tax sale after return for nonpayment of taxes tolls the prescription period....

. . .

Flowing through the numerous acts of assembly dealing with the problem of nonpayment of real estate taxes is the clear intent of the legislature amounting to a public policy to make tax sales and tax titles more attractive to prospective purchasers so that owned by local government by virtue of nonpayment of taxes can be more promptly sold and the land restored to the assessment lists. The big problem in the past that the legislature has strived to change is the many impediments placed on tax titles that drive purchasers away from tax sales. The holding that title to property held by the county for nonpayment of taxes can be obtained by adverse possession is another such impediment deterring prospective purchasers.

. . .

... 'The tendency of modern legislation is to strengthen tax titles. Because they were subject to attack for technical, even trifling, irregularities, they were snares and delusions, and people have been unwilling to invest in them. As a consequence, the coffers of our political subdivisions are

cumbered with properties acquired at tax sales for which there is no ready market, and yet, because taxes upon them remain unpaid and accumulate from year to year, the subdivision is deprived of needful current revenue. The statute is an attempt to correct this condition by making tax titles more attractive and therefore more readily marketable, and it must be presumed that ... the legislature intended "to favor the public interest as against any private interest"....'

... The time has come for the courts to recognize and respect the intention of the legislature in this field and to realize that 'changing conceptions of the scope and functions of government', clearly call for a determination that adverse possession does not run against the political subdivisions holding land for tax sales for nonpayment of taxes...." [Citations omitted.]

There are several cases that, in one respect or another appear to hold to the contrary. *See Tanner v. Michigan Trust Co.*, 220 Mich. 260, 189 N.W. 841 (1922) (that court held, based on *Lawson v. Bishop*, 212 Mich. 691, 180 N.W. 596 (1920), that tax sales did not interrupt the continuity of a fifteen-year adverse possession period); *Craig–Giles Iron Co. v. Epling*, 135 Va. 74, 115 S.E. 534 (1922) (holding that a tax sale vests only the title of the delinquent taxpayer). There are several cases concerning a co-tenant of property attempting to divest other co-tenants through purchase at a tax sale. *Smith v. Smith*, 211 Miss. 481, 52 So.2d 1 (1951) (these cases generally are decided on the basis that when the purchasing co-tenant at the tax sale purchases, he is in essence acting in behalf of the other co-tenants, and is in effect, paying the taxes). In *Du Page County Collector v. Bodoh*, 98 Ill.App.3d 950, 54 Ill.Dec. 301, 424 N.E.2d 1204 (1981), the intermediate appellate court noted that while, ordinarily, a "stranger" has no right to redeem, legal or record title is not required in order to redeem. A person seeking to redeem "need only have an undefined interest in the property." *Id.* at 952, 54 Ill.Dec. 301, 424 N.E.2d at 1207. Although the position of the Illinois court does not seem overly persuasive, we need not

address that issue in this case as there was no effort made to redeem the property at issue.

Additionally, there are several other cases that cannot be neatly compartmentalized. They include, *Picerne v. Sylvestre*, 113 R.I. 598, 324 A.2d 617 (1974), where the appellate court opined that the alleged adverse possessor should at least have been able to present a claim of adverse possession, in opposition to the tax sale redemption procedure. *Picerne*, however, involved a claim that a completed adverse possession had occurred after the tax sale and before redemption foreclosure. Even that court noted, "Under our law, the collector's deed is in the nature of an independent grant from the sovereign which bars or extinguishes all former titles, interests, and liens not specifically excepted. The title conveyed is absolute...." *Id.* at 600, 324 A.2d at 618. Then there are cases not on point but that concern special statutory provisions relating to a shortened period for adverse possession by **purchasers at tax sales** who are attempting to challenge the redemption rights of the record owner/defaulting taxpayer. *See Rabren v. Osmon*, 613 So.2d 390 (Ala.1993) (where the court affirmed the concept but nonetheless held that Rabren had not proved an adverse possession in the first instance).

## IV. Conclusion

We perceive that the position that the Maryland courts have adopted in the past as to the status of tax titles arising out of proper tax sales, a position we now reaffirm in this case, is consistent with the majority view around the country—that properly acquired tax titles are new grants of title by the sovereign entity. Therefore, appellants' adverse possession of the property did not survive the proper foreclosure of redemption and appellants have no claim to the property.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**